THOMAS L. FREYTAG AND SHARON N. FREYTAG, ET AL.,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos.  4934-82,  9307-82, 27146-82,      Filed October 21, 1987.
29012-82,  1240-83,  3250-83,
8616-83, 33016-83,    204-84,
3749-84,  7658-84, 11821-84.

*Robert M. Fink, Richard J. Sideman, Ellen I. Kahn, Charles R. Billings, Barry M. Bloom, John M. Campbell, Robert J. Chicoine, John S. Pennish, Thomas E. Redding,* and *Robert E. Wilbur,* for the petitioners.

*Stephen M. Miller, Joyce E. Britt, Robert W. Towler,* and *James M. Eastman, Rebecca T. Hill,* for the respondent.

OPINION

STERRETT, *Chief Judge*: This case was assigned to Special Trial Judge Carleton D. Powell pursuant to the provisions of section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) and Rule 180 et seq.[1] The Court agrees with and adopts the opinion of the Special Trial Judge that is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

POWELL, *Special Trial Judge*: There are currently more than 3,000 cases in this Court that involve the issues presented in these cases. The common denominator of all the cases is that each petitioner entered into alleged financial transactions involving forward contracts for Government mortgage-backed securities with First Western Government Securities (First Western). These cases were selected as so-called test cases.[2] As we view the cases, the

---

[1]All statutory references (except as to sec. 108 of the Tax Reform Act of 1984) are to the Internal Revenue Code of 1954 as amended, and as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise provided.

[2]The years and deficiencies involved, residences of petitioners at the time the petitions were

primary issues for decision are: (1) Whether these transactions should be recognized for Federal income tax purposes, (2) if so, whether they were entered into for profit under the standard set forth in section 108 of the Tax Reform Act of 1984, as amended, and (3) whether certain petitioners are liable for additions to tax for negligence.

## FINDINGS OF FACT

A. *First Western, the Supporting Characters, and the Program*

First Western is an Illinois corporation with offices in New York, New York, and San Francisco, California. Its president and sole shareholder is Sidney Samuels. Mr. Samuels holds a law degree. He was a revenue agent of the Internal Revenue Service and subsequently was in private practice in California until 1977. In 1977, he became a general partner in Price & Co.,[3] a dealer in stock options. In 1978, he formed Samuels & Co. (later Samuels, Kramer & Co.) and First Western. Samuels & Co. was an investment advisory company specializing in the futures markets. First Western is described by Mr. Samuels as a dealer in Government securities. From 1978 to mid-1980, Samuels & Co. advised customers with respect to transactions with First Western by recommending "portfolio selections" of forward contracts based on the customer's interest rate forecast. After that time, First Western took over the functions of Samuels & Co.

In 1978, First Western began marketing portfolios of "forward contracts" for securities of the Government National Mortgage Association (GNMA's) and the Federal Home Loan Mortgage Corporation (FMAC's).

GNMA Securities, also commonly referred to as "Ginnie Mae's," are registered certificates which represent undivided interests in a specified pool of mortgages guaranteed by GNMA, the Veteran's Administration, the Federal Housing Administration, or the Farmers Home Administration. These pools contain approximately $1 million of mortgages. GNMA security holders are protected by the full faith and

---

filed, and respondent's adjustments are set forth in the Appendix.

[3]See *Price v. Commissioner*, 88 T.C. 860 (1987).

credit of the United States Government. The stated maturity of a GNMA pool depends on the mortgages that underlie it. During the period with which we are concerned, the coupon or interest rate of the pools in existence varied between 6.5 and 16.5 percent. Most single-family, residential mortgages carry a stated maturity of 30 years.

Although Ginnie Mae's are not callable, the underlying mortgages may be prepaid at any time. Due to the prepayment of principal on single family home pools, the average maturity of a pool is considerably less than 30 years. High coupons would pay down faster than low coupons, particularly when interest rates fall. The market practice is to quote Ginnie Mae yields on a pool of such mortgages to a 12-year half-life (i.e., the point in time when the principal amount of the pool is expected to be repaid). FMAC securities or "Freddie Macs" are participation certificates representing an undivided interest in a pool of conventional (non-VA and non-FHA) mortgages, the principal and interest are guaranteed by the Federal Home Loan Mortgage Corporation, a corporation owned by the Federal Government. They also are subject to prepayments. While there are differences in these securities, for our purpose, those differences are not relevant.

## The Portfolios

A forward contract is a transaction in which two parties agree to the purchase and sale at a future time, known as the settlement date, of a commodity, financial instrument, or security under the terms negotiated by the parties. Forward contracts are similar in concept to futures contracts; the latter, however, are for short periods of time, contain standardized terms, and are traded on a regulated board or exchange. GNMA and FMAC forward contracts are exempt from registration under the Securities Act of 1933. Forward contracts in these securities were developed because, while the mortgagee was committed to loan the funds, the actual mortgage would not come into existence for 60 or 90 days. During this time, the mortgagee was at risk. Thus the concept originated as a device to "hedge" that risk. There is an active market for forward contracts; however, that market was not designed for individual

investors.[4] In the market, forward contracts for 5 or 6 months or longer are rare because of the extreme financial risks involved.

A forward contract to purchase a security, or a "long position," represents an obligation to accept delivery of the underlying security on a specified day. A forward contract to sell a security, or a "short position," represents an obligation to make delivery of the underlying contract on a specified day. An outright or "naked" long or short position involves great risk. The risk in an outright position is that the price of the underlying security will rise or fall.

The simultaneous holding of a long position for one settlement date and a short position for another settlement date constitutes a "straddle." The long and short positions are commonly referred to as the "legs of the straddle." A straddle theoretically enables an investor to close out the loss leg and offset the loss recognized against ordinary income or capital gain from another source, while holding the gain leg open until a later year with an offsetting position to protect the unrealized gain. This technique theoretically results in both tax deferral and conversion of ordinary income into long-term capital gain. In a straddle position, the risk is that the spread or the difference between the prices of the two legs will widen or narrow. With respect to the petitioners, First Western dealt only in complete portfolios of straddles in GNMA and FMAC forward contracts.

First Western structured the portfolios such that the short and long legs of the straddle consisted of forward contracts calling for the delivery of underlying securities with different interest rate coupons and different settlement dates. The settlement dates of these contracts were often 18 months and longer. These strategies are called "coupon spreading" and "time spreading," respectively, and they implement several market assumptions. First, the price of fixed income securities is inversely related to the market interest rate. Second, the price of a higher coupon security changes more, for a given change in interest rate, than that of a lower coupon security. This assumption is critical to the First Western theory of coupon spreading. Third, the

---

[4]An individual trading even a $1.8-million contract is very unusual.

longer the maturity of a fixed income security, the greater will be its price change for a given change in interest rate. Fourth, the larger the portfolio, the larger will be its dollar change in value for any change in the interest rate. These assumptions require that all other market variables remain constant.

## Prices

The prices for the GNMA forward contracts in issue were not quoted on an exchange. Rather than consult the primary dealers for a market price,[5] First Western used computerized pricing algorithms to set prices for the forward contracts involved here. First Western did not quote its prices to market dealers.

Prior to January 14, 1980, First Western used the Telerate[6] quote for the cash price of a GNMA 9.5 coupon to generate cash prices for other GNMA and FMAC coupons. From the Telerate composite quote for the cash price of the GNMA 9.5, First Western calculated the GNMA yield for this security. This step is called a price-to-yield conversion. First Western then calculated various coupon yields by assuming a constant yield spread between any two GNMA or FMAC coupons—always equal to 20 percent of the difference between two GNMA's or two FMAC's and always equal to 0.03 percent as between a FMAC and a GNMA with the same coupon rate.[7] This step is called a yield-to-price conversion.

From these assumed GNMA and FMAC yield numbers, First Western calculated cash prices on which it traded forward contracts. Specifically, First Western calculated the cash price for each GNMA and FMAC coupon that would

---

[5]Dealers determine the market price for forward contracts in Government mortgage-backed securities by calling a number of other dealers and asking each to quote a price. Dealers, however, did not make markets in the long-term contracts that First Western wrote.

[6]Telerate, Inc., provides composite quotations of bid and ask prices for GNMA's available for immediate and for delayed delivery. During the years 1978 through 1982, Telerate never quoted prices for GNMA forward contracts with settlement dates more than 6 months in the future. First Western, however, wrote forward contracts with average delivery dates of 14 to 22 months in the future, and it wrote some contracts with delivery dates as far out as 30 months.

[7]Robert Shiffer, one of respondent's experts, testified that only once in 16 years had he observed a 3-day constant yield spread between securities. That case involved a dishonest employee who deliberately programmed the computer to show a constant yield spread between the two securities, and it cost his firm $1.2 million.

result in a GNMA yield or FMAC yield already calculated for that coupon.

First Western used these assumed cash prices as a starting point from which to calculate forward prices. In so doing, First Western assumed a linear relationship between the forward price for each maturity and the cash price. In other words, forward prices for all coupons and maturities precisely tracked the movement in the cash price, which itself depended on the price of the GNMA 9.5.

First Western produced this linear relationship between cash prices and forward prices by using its own cost of carry model which entailed a number of implicit and explicit assumptions. First Western assumed a constant 10.65-percent cost of carry on forward contracts with maturity dates of up to 2 years in the future.[8] Also, First Western implicitly assumed there would be no prepayments in any mortgage pools before the maturity of the forward contract. Since a forward contract specifies delivery of an agreed face amount of a particular GNMA or FMAC coupon, holders of long positions in forward contracts, unlike holders of GNMA or FMAC securities, enjoy protection against prepayment during the life of the forward contract. Thus, forward contracts would be theoretically more valuable than a cost-of-carry calculation assuming no prepayments would predict. This would be especially true for seasoned high-coupon GNMA's or FMAC's and would become increasingly important as interest rates fall.

In sum, prior to January 14, 1980, First Western's pricing formula made several assumptions which reduced the risk that prices of different contracts would move independently. For example, the assumption of a constant yield spread among all coupons eliminated the risk that cash prices for these coupons would move independently. Similarly, the assumption of a constant carry rate eliminated the risk that longer maturity forward prices would move independently of shorter maturity contracts due to changes in the prevailing market interest rate. By making

---

[8] In a period of high interest rate volatility, the assumption of a 2-year constant carry rate is arbitrary and simply untenable. During the period in issue the interest rates on 2-year Treasury notes, a comparable default-riskless security ranged from 7.57 percent to 16.48 percent. Similarly, interest rates on 3-month Treasury bills ranged from 6.29 percent to 16.30 percent.

these assumptions and by limiting the market data input to the cash price of the GNMA 9.5, First Western insured that its forward contract prices moved in lockstep with the price of the GNMA 9.5, and with each other. As a result, First Western's pricing algorithm guaranteed that the two legs of any straddle moved in tandem. Essentially, First Western assumed away all market risk other than movement in the price of the GNMA 9.5.

Effective January 14, 1980, First Western unilaterally altered its pricing calculations for purported reasons of "empirical risk control." The changes implemented were twofold. First, First Western calculated cash prices differently for all coupons, including the GNMA 9.5 benchmark, by adding an "adjustment factor." In other words, First Western took the GNMA 9.5 cash quote from Telerate and added to it an adjustment factor to obtain its own GNMA 9.5 cash price. By adding the adjustment factor, First Western reduced the volatility of its own cash price for the GNMA 9.5 relative to that of the market price for the same security.

Second, First Western changed its cost-of-carry calculation for forward contracts. Previously, First Western calculated the cost of carry using the standard time frame between the current date and the maturity date of the forward contract. After January 14, 1980, however, First Western calculated the cost of carry for the time period between January 14, 1980, and the maturity date.[9] This cost-of-carry calculation is completely arbitrary and is unrelated to any standard financial calculations or analysis.

First Western implemented these pricing modifications after a dramatic increase in the level and volatility of both mortgage interest rates and Treasury bill and note rates. As a practical matter, "empirical risk control" was simply a means by which First Western achieved an even greater degree of control over the pricing of its contracts; first, by substituting a constant for a variable time in the calculation of forward prices from spot prices and, second, by systemat-

---

[9]The following example serves to illustrate the impact of this change on First Western prices. Under the original formula, if First Western priced a contract on Jan. 1, 1983, for delivery on Mar. 1, 1983, it would add 2 months' cost of carry to the calculated cash price of the underlying coupon. Under the new formula, using the same example, First Western would add over 3 years' cost of carry to the adjusted cash price.

ically attenuating the effects of market influences on the price of the GNMA 9.5—the only point of contact between First Western's contracts and the actual market.

The market risks of increased price volatility, increased carry rates, and independent price movement cause true issuers of forward contracts in fixed income securities to limit the size of the positions they allow their customers to take. Avoiding market prices and their inherent risk enabled First Western to structure straddle portfolios with uncommonly large positions. As a result, First Western offered its clients enormous tax benefits compared to their "margin" deposits and without increasing its own risk of loss.

## Settlements

Settlement of forward contracts is predicated on the assumption that delivery of the underlying security will be made.[10]

Whether or not actual delivery takes place, the effective possibility of actual delivery, combined with the possibility of entering into individual contracts, gives economic reality to forward and futures markets for financial instruments. The effective possibility of delivery links the forward or futures market to the underlying cash market because the forward or futures price must nearly converge with the cash price of the underlying financial instrument as the maturity of the forward or futures contract approaches. Otherwise, arbitragers could make riskless profits by taking opposite positions in the forward market and the cash market and closing out the position by going to actual delivery.[11]

The other general method of settlement of a futures contract is "setoff." This occurs when the parties enter into an opposite contract for the same security and agree to offset or pair off the liabilities of both contracts. On settlement, the difference in the prices of the two contracts is paid in cash.

---

[10]Dealers customarily execute every trade with the intent to deliver.

[11]For example, if the forward price exceeds the cash price at the maturity of a forward contract, arbitragers will buy the instrument in the cash market at the lower price and sell it in the forward market at the higher price, thus making a riskless profit.

In First Western's program, physical delivery, the actual transfer of the underlying instrument, did not occur.[12] Indeed, First Western's computer program contained no provision for delivery.

First Western used two additional methods of settling contracts that, while having their genesis in the jargon of financial transactions, were used in a fashion far different from that generally contemplated. Generally, cancellation is used, as its name suggests, to rescind or cancel a transaction in case of an error or where there is a substitution of contracts. First Western and its customers, however, used cancellation in situations where there were no errors or substitutions. Rather, "cancellation" was used because theoretically it resulted in ordinary gain or loss for want of a sale or exchange.

The second unorthodox method of closing transactions was by assignment. Again, an assignment of a contract has a place in the financial markets. It is used to effect delivery of a security to a third party to whom the purchaser is obligated. First Western, however, used assignments as a substitute for sales necessary to achieve a capital gain or loss. First Western controlled whether a client could assign or cancel a contract. First Western charged fees for cancellations and assignments.

First Western's use of these latter methods of settlement was solely for tax purposes. Legs of straddles with losses generally would be canceled. The gain legs generally would be assigned. In these cases, the assignors' (petitioners') accounts with First Western were credited with approximately 99 percent of the net "value" of the contract. The assignments in these cases were to Benson Financial (Benson), Ionian Financial Ltd. (Ionian), or National Mortgage Corp. of America (National Mortgage).

The settlement by First Western of the contracts "assigned" to Benson, Ionian, and National Mortgage was peculiar. The contracts provided that "The coupon rate

---

[12]There are several possible reasons why First Western clients avoided delivery. One explanation is that the clients would have been financially incapable of making or taking delivery (due to the size of the positions in their portfolios). Also, clients always held entire portfolios rather than individual contracts. Since the two sides of the portfolio were similar in size, if a client went to delivery on contracts on one side of the portfolio, First Western might go to delivery on contracts on the other side of the portfolio and thereby decrease the client's net gain.

specified above is the only coupon that may be delivered." It does not appear, however, that any of the assignees ever demanded delivery. Rather, the accounts were apparently settled for cash, whereby the assignees received approximately 1 percent of the value of the contract at the time the contracts were assigned. That value was determined by First Western's pricing. In the case of petitioner Harby, for example, First Western's records showed that he assigned contracts to National Mortgage having a net value of $143,523 on March 3, 1982. The assignment, however, was dated March 23, 1982, and bears a "received" stamp of May 19, 1982. The contracts that were assigned had expiration dates of March 7, 1982, and May 19, 1982. First Western's "Schedule of Assignment Fees" lists $1,450 as the amount "due" National Mortgage from the assignment. National Mortgage's account with First Western shows that the assigned contracts were put into National Mortgage's account with First Western where they immediately were "canceled" or "set off" with debits to its margin account and credits to the assignors' accounts. Thus, there was absolutely no risk to the assignee, the assignor, or First Western.

The assignments to Benson and Ionian were similar. In total, by May 31, 1983, Benson received assignments having a value of $22.8 million, Ionian $298.3 million, and National Mortgage $117.8 million. While the exact amount that National Mortgage received is unclear, Benson received $228,019 and Ionian $1.3 million from First Western.

### Margins and Fees

A margin is a good-faith deposit made by a trader with a dealer and is not a downpayment on the security. In the marketplace, the customer's margin neither limits his potential liability nor bears any relationship to tax considerations. The First Western program, however, based margin requirements on the client's "tax preference" (viz, the requested amount of tax loss to be realized in a given year). Furthermore, First Western limited its customers' potential monetary loss to their initial margin.

For an over-the-counter market maker, fees are generally a function of price. A dealer, for example, will "mark up"

the price of the security in its "ask" price. First Western's fees, in contrast, were merely a function of the customers' "tax preference." On First Western's books, the fees were immediately "budgeted" out of the "margin," and a fee cap was established. The budgeted fees were ranged between 40 to 70 percent of the margin,[13] or 7 to 8 percent of the tax preference. Thereafter, fees were charged against the account on the various transactions until the budgeted fees were satisfied.

## Hedging

Actual dealers in securities of this nature use hedging to limit their risks. A perfectly hedged dealer would be in balance—i.e., it would be short the same amount of contracts as it would be long. This would be desirable in times of market volatility. First Western maintained an account with Conti Commodity (Conti) that it claimed was a hedging account for purchasing futures of GNMA's. While First Western may have maintained an account with Conti, its daily hedging reports show extremely large exposures, particularly in view of the prevailing interest rate volatility and First Western's limited capital. These reports reveal that First Western was routinely exposed to the extent of many times its net worth. First Western's balance sheets that are in the record showed the following equity:

| Date | Amount |
|------|--------|
| Dec. 31, 1979 | $3,413,000 |
| Mar. 31, 1980 | 2,615,000 |
| Mar. 31, 1981 | 17,937,000 |
| Mar. 31, 1982 | [14]6,339,000 |

The following is a limited list of First Western's exposure on certain dates:

| Date | Amount |
|------|--------|
| Nov. 11, 1980 | $30.4 million |
| Jan. 23, 1981 | 53.2 million |
| Mar. 24, 1981 | 48.9 million |

---

[13]In other words, because First Western took approximately 50 percent of the margin deposit as its fee, the client had to double his investment before he could make a profit.

[14]At some time between Jan. 1 and Mar. 31, 1982, all the outstanding stock of First Western was transferred from Sidney Samuels to First Western Investments, Inc., and a $20 million dividend was paid.

| Date | Amount |
|------|--------|
| Apr. 14, 1981 ........................ | [15]$1.1 billion |
| June 25, 1981 ........................ | 26.0 million |

For substantial periods of time, the number of futures contracts that were the predicate for the hedging program remained constant. Furthermore, at least on one occasion First Western was hedged the wrong way—its risk was on the short side and its "hedging" account was also short.

First Western, however, had other methods of controlling risk. When a leg was "canceled" another leg with contracts of similar coupons and time lengths to those in the open leg would be purchased or sold short. Since the pricing algorithms essentially guaranteed that the values of the contracts would move in lockstep, the account was, in First Western's terminology, "neutralized."

B. *Finders and Customers*

While there were nine test-case petitioners,[16] we find it unnecessary to delve into the minutiae of the transactions between each petitioner and First Western. Rather, it seems to us more relevant to highlight the relationship as reflected by the general business dealings between First Western and its customers. In this regard, we note that, while the transactions of the test case petitioners with First Western may be typical, the individual petitioners are not typical because of the non-random selection process of the test cases. Petitioners chose five cases, and respondent chose five cases. Understandably, both sides chose cases that were more favorable to their respective views of the First Western transactions. For example, four of the nine test-case petitioners had profits; in First Western's program, however, approximately 3 percent of its customers had profits from trading its forward contracts, and of this latter number, First Western employees showed substantial profits, with Mr. Samuels leading the pack. Nevertheless, somewhat of a pattern does emerge from the test cases.

---

[15]This was claimed to be a statistical "glitch." But if, as Mr. Samuels and Mr. Bender testified, these reports were reviewed daily, it is difficult to see how such a glitch would not have been spotted immediately and corrected. If it were a glitch, that omission from that data would not alter our overall view on the propriety of the hedging program.

[16]Originally there were 10 test cases. Wilhide, however, was severed. The remaining petitioners have agreed to be bound by the record containing facts relevant to Wilhide as they relate to First Western's program.

First Western did not advertise. Rather, its program was spread by word of mouth among accountants, lawyers, and financial consultants—the "finders."[17] Finders were paid by First Western—the remuneration was based upon a percentage of the margin and tax preference. In some cases, the finders also charged their clients. Typically, a finder or customer would obtain a package from First Western. In cases where "finders" were involved, at least as far as the test cases reveal, the customer had little or no understanding of the program.

## Womble

Petitioner Womble is a physician.[18] During the last quarter of 1980, he contacted Robert Taylor, an attorney in Dallas, Texas. Taylor had written a "Confidential Memorandum to Interested Clients" in which he outlined "the best potential tax shelter investment I have reviewed in the last ten years." The memorandum noted "an investor would show a tax loss of eight to one [and], [i]f the investment is successful the investor may receive a cash profit along with a tax loss—an infinite ratio."[19] Robert Taylor subsequently wrote to Dr. Womble:

Shortly before the money went in for this partnership investment, First Western Securities decided to allocate a slightly higher amount of the investment to the margin account itself. The reason for this is to give flexibility for additional trades to generate gains and protect the investment from attack by the Revenue Service on the ground that there is no profit motive.

The net result will be that the total amount of losses generated for 1980 will be slightly less than the $300,000 contemplated, but not enough to make very much difference. By the time the trading is completed for this year, my guess is the total loss available will be in the $280,000 to $290,000 range. Every $7,000 invested should still receive losses in the

---

[17]As noted before, originally Samuels & Co. (later Samuels, Kramer & Co.) and First Western had different functions. Samuels & Co. designed the portfolio and First Western executed the "trades." Later the former function was absorbed into First Western; there is not, however, any substantive difference in the two methods of operations. Accordingly, for simplicity we omit the role played by Samuels & Co. from our discussion.

[18]Dr. Womble's transations with First Western were conducted through a partnership (Investadox) of which he was the administrative partner. During the trial, the parties have essentially ignored the partnership entity and, for the purposes of this discussion, we do the same.

[19]Petitioners assert that respondent cannot attribute this statement to First Western. Perhaps not, but the statement is clearly indicative of the perception of the program that many participants shared.

neighborhood of $46,000 to $49,000 for the year, depending upon the results of the trading.

Dr. Womble executed the standard First Western documents—an interest rate forecast, a standard customer's agreement, and a new account application. The customer's agreement provided, inter alia, that First Western "may without demand for margin, whenever in [its] discretion [it] deem[s] it advisable for my or [its] protection, sell any or all securities held in any of my accounts * * * , and [it] may borrow or buy in any securities required to make delivery against any sale effected for me * * * . Such sale or purchase may be public or private and may be without * * * notice to me and in such manner as * * * [it] in * * * [its] discretion may determine." These documents were forwarded to A. F. Campbell & Co., Inc. (a finder) with checks totaling $42,000. Campbell then sent the package including a "tax data" statement to First Western's office in San Francisco. The "tax data" statement requested an ordinary loss for 1980 in the amount of $280,000 and a long-term capital gain for the year 1982 in the amount of $280,000. The San Francisco office generally put this information in its computer, aggregated all requests received that day, and sent them by a "night letter"[20] to the New York office. Portfolios of straddle positions were then constructed by a computer, the prices set by the algorithm discussed above. On November 26, 1980, First Western transmitted the proposed portfolio to Dr. Womble. This communication provided that "[u]nless you advihe [sic] us otherwise by 1:00 PM EST on November 28, 1980, we will execute the required trades at the prices current on that date."[21] The portfolio provided:

| Action | Issue | Settlement date | Face value |
|--------|-------|-----------------|------------|
| Sell short | GNMA 9.00% | 3/17/82 | $8,500,000 |
| Sell short | GNMA 11.00 | 3/17/82 | 7,500,000 |
| Buy | GNMA 10.00 | 6/16/82 | 8,500,000 |
| Buy | GNMA 8.00 | 6/16/82 | 7,600,000 |

---

[20] A "night letter" was essentially San Francisco's computer transmitting data to New York.

[21] First Western put on the first trade in the partnership's name on Nov. 28, 1980, when, in fact, the partnership was not validly formed until Dec. 16, 1980. Indeed, Dr. Womble had not even returned the standard First Western documents until Dec. 3, 1980. The partnership has never filed a partnership income tax return.

Dr. Womble received confirmations dated November 28, 1980, showing the price of each coupon. On December 9, 1980, Dr. Womble received the following confirmations:

| Sell short | GNMA 11.00% | 3/17/82 | $600,000 |
| Buy | GNMA 8.00 | 6/16/82 | 9,900,000 |

On December 11, 1980, the following transactions were confirmed:

| Short sale | GNMA 11.00% | 3/17/82 | $800,000 |
| Buy | GNMA 8.00 | 6/16/82 | 900,000 |

On December 15, 1980, the following transactions were confirmed:

| Buy | GNMA 9.50% | 10/20/82 | $3,800,000 |
| Buy | GNMA 8.50 | 10/20/82 | 3,300,000 |
| Buy | GNMA 9.50 | 9/15/82 | 3,200,000 |
| Short sale | GNMA 9.00 | 3/17/82 | 1,200,000 |
| Canceled | GNMA 8.00% | 6/16/82 | 9,900,000 |

On January 22, 1981, the following transactions were confirmed:

| Buy | GNMA 10.00% | 10/20/82 | $4,600,000 |
| Sell short | GNMA 11.50 | 5/19/82 | 1,200,000 |
| Buy | GNMA 8.50 | 10/20/82 | 1,000,000 |
| Canceled | GNMA 8.00 | 6/16/82 | 7,600,000 |
| Canceled | GNMA 11.00 | 3/17/82 | 600,000 |
| Canceled | GNMA 11.00 | 3/17/82 | 800,000 |
| Canceled | GNMA 9.00 | 3/17/82 | 1,200,000 |

On February 2, 1981, Campbell sent to First Western another tax data sheet requesting an ordinary loss of $131,000 for 1981 and a capital gain of $131,500 for 1983. Three days later, First Western sent a letter to Dr. Womble requesting an additional "margin" of $16,900 within 5 days. This letter was rescinded on February 18, 1981.

The trading process repeated itself with various purchases, short sales, and cancellations. On December 7, 1981, First Western wrote a letter requesting an additional $12,000 margin by December 17, 1981. For 1980 and 1981, First Western's transactions resulted in losses in the amounts of $284,744 and $131,682, respectively. On February 2, 1982, First Western wrote to Dr. Womble informing him that he had forward contracts coming due during that year. First Western records show that the contracts were

assigned to National Mortgage on February 26, 1982. Dr. Womble assigned those contracts to National Mortgage for approximately 99 percent of their net value. Some of the contracts assigned had settlement dates expiring over a year later. On April 6, 1982, Dr. Womble received a check in the amount of $6,117 from First Western closing out the account. Dr. Womble's out-of-pocket loss was approximately $48,000, not considering the purported tax benefits he received.

While Dr. Womble had some financial experience, it is obvious that he had very little understanding of First Western's program. He did not know that First Western made the market in these securities. He believed he could check First Western's prices by looking in the Wall Street Journal, but he never did. He had no knowledge of First Western's fee structure. He never attempted to verify whether his interest rate forecast was, in fact, correct. He had predicted that interest rates would go up and never changed that forecast. In May 1981, however, First Western changed his forecast, and Dr. Womble was not aware of the change. We find this somewhat bemusing because, while there were peaks and valleys, interest rates generally did increase during this period. When questioned about the initial proposed portfolio, he responded: "I bought Ginnie Maes at 10 and at 8 * * * [a]nd I sold at 9 and 11." This apparently refers to the coupon of the contract, and clearly indicates that he had no understanding of that portfolio.

### Lewis

Petitioner Lewis is an engineer. He was introduced to First Western by Marvin Neese whom he had known for only 3 or 4 months. Mr. Lewis had no knowledge of Mr. Neese's financial expertise except that he managed other First Western accounts. Nonetheless, he simply turned the account over to Mr. Neese. Mr. Lewis never understood the portfolio selection, never checked prices, did not know what a mortgage-backed security was, did not know that there was no market for mortgage-backed forward contracts for delivery in 14 to 22 months, and did not know the difference between a future and a forward contract. Mr. Lewis invested $5,000 in First Western's program. First

Western first informed Mr. Lewis of the trades it had devised to implement his interest rate forecast by letter dated August 29, 1979, even though it executed trades for him on August 6, 1979. The account records show that he (or Mr. Neese) requested a $50,000 loss for 1979 and a $35,000 loss for 1980. Among other deductions and losses related to First Western, he claimed ordinary losses of $49,305 for 1979, and $37,768 for 1980. On April 28, 1982, First Western credited Mr. Lewis's account with $9,463 from National Mortgage, for contracts that had been "assigned," even though Mr. Lewis did not assign the contracts until June 4, 1982. Mr. Lewis's situation is exceptional in that he took out more money than he put in.

### Harby

Another successful player in the First Western program was petitioner Harby, a retired Army officer who also relied on Mr. Neese. Col. Harby had no knowledge of the fee structure, he was "embarrassingly naive about this program," he had little knowledge of mortgage-backed securities, did not know that there was no market for 14- to 22-month forward contracts, did not understand the difference between offset and cancellation, and did not know the difference between future and forward contracts.

For 1979, First Western was requested to produce a $50,000 loss, and Col. Harby claimed a deduction in the amount of $54,777. For 1980, a total loss of $68,500 was requested, and a $76,624 loss was claimed. For 1981, a $50,000 loss was requested and a $33,798 loss was claimed. There is, however, one aspect of Col. Harby's account that is noteworthy. On November 19, 1980, First Western canceled a contract in which Col. Harby had a $30,450 profit. Col. Harby wrote to First Western on January 16, 1981, eight weeks later, and in the subsequent tax year, and requested that the contract be "reinstated" because the cancellation had not been "authorized" by him. We find it peculiar that an investor, allegedly seeking a profit, would seek to eradicate a $30,000 profit. Nonetheless, and notwithstanding the provisions of the agreement with First Western giving First Western the authority to trade, First Western reinstated the contract. The contracts in Col.

Harby's account were assigned to National Mortgage on March 3 and May 7, 1982, and credits were made to his account. Col. Harby did not execute the assignment forms, however, until March 23 and July 6, 1982.

## Poulos

Dr. Poulos is a surgeon who was introduced to First Western by Robert Schmidt. Mr. Schmidt is an "estate planner" operating through "Interplan, Inc." Dr. Poulos "really didn't understand" First Western's program and relied on Mr. Schmidt. Mr. Schmidt received payments from both First Western and Dr. Poulos for his services. In 1978, Dr. Poulos paid $15,000 to First Western and requested a $150,000 ordinary loss. He claimed a loss of $152,359 on his 1978 tax return. Dr. Poulos did not receive confirmations for the 1978 trades made in November and December until April 13, 1979. For 1979, Dr. Poulos paid to First Western $27,500[22] and on September 26, 1979, requested an ordinary loss of $175,000 and a short-term capital loss of $100,000.[23] On his return for that year, he deducted a $183,416 ordinary loss and reported $39,671 as a net short-term capital gain. For 1980, Dr. Poulos paid to First Western $19,500, and requested a $150,000 ordinary loss. Dr. Poulos reported on his 1980 return a short-term capital gain of $241,380, a short-term loss of $209,720, and an ordinary loss of $167,244. By an assignment dated March 1, 1982, Dr. Poulos assigned the contracts in his account to Ionian, and his account was credited with $413,586. Dr. Poulos lost money if no consideration is given to the tax deductions. In addition, Dr. Poulos paid Mr. Schmidt (through Interplan, Inc.) $7,500 in both 1978 and 1980 and deducted these amounts on his tax return. He paid Mr. Schmidt (again through Interplan) $10,750 in 1979 and claimed a deduction in the amount of $12,500. There is no basis in this record for determining what portions of these fees were for services other than those connected with First Western's program.

---

[22]An additional $2,250 was transferred to First Western from Dr. Poulos' account with Conti.

[23]Dr. Poulos realized a $144,858 gain on Mar. 26, 1979, and reported that gain on his return. His transactions with First Western after Sept. 26, 1979, resulted in a short-term capital loss of $105,188.

*Timm*

Mr. Timm is a geologist and was also introduced to First Western by Mr. Schmidt. Like Dr. Poulos, Mr. Timm did not understand the First Western program and relied on Mr. Schmidt. For 1978, Mr. Timm paid $5,000 to First Western, and Mr. Schmidt requested a $50,000 ordinary loss. On his 1978 return, Mr. Timm claimed an ordinary loss in the amount of $50,476. He also deducted $2,500 as "investment counsel fees," apparently for services rendered by Schmidt. As with Dr. Poulos, Mr. Timm did not receive confirmations for 1978 First Western transactions until April 13, 1979. After the 1978 year, Mr. Schmidt wrote to Mr. Timm:

> We reduced the risk of trading government securities by entering into a spread technique with those instruments used in the forward (over-the-counter) market. We leveraged (traded large purchases on a small margin) your investment to purchase instruments with a total face value of $4 million. By cancelling one-half of the forward contracts on December 28th, you sustained a $50,476 ordinary loss. To complete the hedging technique, the remaining forward contracts sold in 1979 have resulted in a short term capital gain of $49,536. This loss reduced your 1978 income taxes by (an estimated) $17,600. When deducting the cost of your investment of $4,440 from your tax savings, your estate has increased by approximately $13,225. This equates out to a 298% net capital return in six months. The interest return, when properly reported on an annual basis, would be 595%.

In July 1979, Mr. Timm sent First Western another $5,000. Mr. Schmidt wrote to Mr. Timm, on July 23, 1979, that he "cannot complete your tax shelter until all fees are paid." The letter concluded "my limited time can only be spent with clients who are willing to pay for services rendered." Mr. Timm sent Schmidt a check of $1,000 and Schmidt submitted a tax data sheet on September 24, 1979, requesting a $50,000 short-term capital loss (to offset the 1979 gain from the 1978 program) to be rolled into a long-term gain in 1981. For transactions with First Western, Timm deducted a short-term capital loss in the amount of $58,669.[24] Mr. Timm did not receive confirmations of trades made in March 1979, until June 1979.

---

[24]He also reported a short-term capital gain for transactions before that date in the amount of $46,036.

On June 24, 1980, Schmidt requested a $60,000 ordinary loss and a $75,000 short-term capital loss for 1980. On his 1980 return, Mr. Timm claimed a $62,004 ordinary loss and a net $77,611 short-term capital loss. Mr. Timm paid to First Western $17,550 in 1980. He also deducted $844 as "First Western Gov-Sec-Counsel" and $6,750 as "investment council [sic]." For 1981, Mr. Timm paid to First Western $8,500, requested an $85,000 ordinary loss, and claimed an ordinary loss of $84,523. First Western's records show that Mr. Timm assigned his First Western contracts to National Mortgage on March 10, 1982. Mr. Timm did not execute the assignment contract until March 25, 1982. Mr. Timm lost money in his dealing with First Western.

### Ames

Petitioner Ames was introduced to First Western by John Burns and was a successful participant in First Western's program. As with Messrs. Timm, Womble, Lewis, Harby, and Poulos, Mr. Ames' knowledge of First Western's program was, at best, sketchy, and he relied on Mr. Burns. On November 20 and 27, 1979, Mr. Ames paid a total of $260,000 to First Western and requested a $2 million ordinary loss to be converted into a long-term capital gain in 1981. Mr. Ames understood that his losses would be limited to his $260,000 margin deposit,[25] for otherwise there "would have been a real exposure" and he "would have [had] a real problem." On his 1979 return, Mr. Ames deducted an ordinary loss of $2,029,934 and a $2,000 deduction for an investment advisory fee to Samuels-Kramer. For the year 1980, there is no record of any correspondence from Messrs. Ames or Burns to First Western. Notwithstanding this, transactions with First Western continued in which Ames received losses.

For the taxable years 1980 through 1983, the following net transactions were reported on the tax return:

---

[25]A letter from Sidney Samuels to a Dr. Redy, a non-test-case First Western customer, makes it clear that First Western's policy was to limit losses to the client's margin deposit. "To summarize, the *maximum* cash loss you will sustain in the combined First Western Government Securities, Inc./Conti Commodity Services, Inc. program is $5,000 in 1978 and $5,000 in 1979. Samuels & Co. and First Western Government Securities, Inc. will hold you harmless for any losses in excess of the above."

| Stipulation No. | Amount | Type |
|---|---|---|
| 1980 | | |
| 849 | $9,422,948 | Ordinary income |
| 865 | (10,218,545) | Ordinary loss |
| 878 | 697,994 | Ordinary income |
| 880 | (22,092) | Ordinary loss |
| 886 | (26,700) | Ordinary loss |
| Total | (146,395) | Ordinary loss |
| 1981 | | |
| 898 | 566,331 | Ordinary income |
| 901 | (571,418) | Ordinary loss |
| 905 | (422,647) | Ordinary loss |
| Total | (427,734) | Ordinary loss |
| 1982 | | |
| 920 | 722,707 | Long-term capital gain |
| 928 | (307,245) | Long-term capital loss |
| Total | 415,462 | Long-term capital gain |
| 1983 | | |
| 935 | 5,602,206 | Long-term capital gain |
| 935 | (3,294,181) | Short-term capital loss |
| Total | 2,308,025 | Long-term capital gain |

On February 26, 1982, Mr. Ames excuted an "assignment" of various First Western contracts, having settlement dates of March 26, 1982, to Ionian and his account was credited with $726,376 from Ionian. This transaction was somewhat shrouded by the paperwork. There is nothing in the record to indicate that First Western "approved" the assignment at the time. On November 12, 1982, Ionian wrote to First Western that some assignors had not completed their paperwork. First Western sent a copy of this letter to Mr. Ames and requested that he execute the completed assignments. The assignment forms were sent on December 13, 1982, to Mr. Burns. On the same date, however, First Western wrote to Mr. Ames acknowledging assignments under the same terms as the February 26th assignment.

### Wilhide Corp.

Wilhide Corp. (Wilhide) is engaged in designing and furnishing offices. Wilhide is on a fiscal tax year ending February 28. In February 1980, Wilhide, by its president, Conrad Keado, paid First Western $81,250. Wilhide requested an ordinary loss in the amount of $625,000. On February 13, 1980, Wilhide purchased from and sold short

to First Western various forward contracts for GNMA's among which were:

| Purchase | GNMA 9.50% | 6/17/81 | $7,700,000 |
| Purchase | GNMA 8.25 | 6/17/81 | 6,800,000 |

On February 19, 1980, these contracts were canceled with a loss of $676,685 that Wilhide deducted on its fiscal year tax return. After the close of its taxable year, there was no record of any correspondence between Wilhide and First Western during its 1981 fiscal year. On March 6, 1980, Wilhide had other purchase and short sale transactions with First Western with settlement dates after February 28, 1981. On March 3, 1981, Wilhide purchased $11,400,000 GNMA 11 percent, settlement 9/15/82, and sold $1,200,000 GNMA 10 percent, settlement date 4/21/82. The same day various contracts expiring in 1981 were "canceled" with a resulting gain in the amount of $23,619. These later transactions were "voided" on March 13, 1981. That same day, another group of contracts, including some contracts canceled on March 3, 1981, were canceled with a resulting loss of $441,570 that was deducted on Wilhide's 1982 tax return. On March 16, 1981, Wilhide assigned contracts to National Mortgage with a resulting gain of $1,042,841 that was reported as a long-term capital gain. National Mortgage sent Wilhide a check for $1,042,841. Wilhide endorsed this check to First Western. First Western wrote a check to National on March 18, 1982, for $1,049,677. First Western's records indicate that $6,836 was due National Mortgage. Wilhide never changed its original interest rate forecast because "we did not follow the program as we should have."

### Freytag

Mr. Freytag is a lawyer who specializes in tax aspects of real estate transactions. Mr. Freytag, and at least one of his partners, decided to invest in First Western's program. Mr. Freytag's law firm became a "finder" and introduced at least 18 clients to First Western and was paid approximately $120,000 by First Western. The fees with respect to Mr. Freytag's account were not reported by the firm but applied to the account expenses, and the firm gave the

balance to Mr. Freytag. Mr. Freytag did not reduce the amount of his losses or otherwise report these amounts.

The record does not reveal the amount of loss requested in 1978. For later years, Mr. Freytag, or his agent, requested the following:

|  | Short-term capital loss | Ordinary loss |
| --- | --- | --- |
| 1979 | $70,000 | $100,000 |
| 1980 | | 100,000 |
| 1981 | | 130,000 |
| 1982 | | 140,000 |

The ordinary losses were to be converted into long-term capital gains in subsequent years. Mr. Freytag reported on his tax returns the following:

|  | Short-term capital loss | Ordinary loss |
| --- | --- | --- |
| 1978 | | $70,539 |
| 1979 | [26]$112,308 | 99,403 |
| 1980 | [27]3,000 | 101,794 |
| 1981 | | [28]162,216 |
| 1982 | | 143,001 |

Mr. Freytag sent First Western checks as follows:

| | |
| --- | --- |
| Nov. 3, 1978 | [29]$7,000 |
| Oct. 12, 1979 | [30]11,500 |
| Oct. 21, 1980 | 10,000 |
| Feb. 18, 1981 | 30,000 |
| Apr. 2, 1982 | 10,000 |
| June 22, 1982 | 10,000 |

Mr. . Freytag's account with First Western is noteworthy in that his account frequently showed a deficit balance—i.e., Mr. Freytag owed First Western substantial amounts of money. While First Western sent letters requesting additional funds or "margin," Mr. Freytag never satisfied these requests. Nonetheless, First Western did not close his account nor did it close his positions. Indeed, First Western allowed Mr. Freytag to increase his risk to $15,000 per point, when he had a negative account value of $35,864, and to $25,000 per point, when he had a negative account value

---

[26]Used to offset gain of $106,005.

[27]Carried over from 1979 from First Western transactions.

[28]Mr. Freytag claimed an ordinary loss in the amount of $126,188.

[29]There were two checks—one payable to First Western for $2,000 and another payable to ContiCommodity for $5,000.

[30]$4,174 was also transferred from ContiCommodity.

of $97,117. A letter written by Mr. Freytag to First Western, apparently in 1978, explains:

You agree with the undersigned that the grant that power [of attorney] creates the duty on your part to liquidate the account of the undersigned whenever market conditions threaten losses in excess of the margin deposits in those accounts. In the event of market conditions adverse to the positions taken by me, you hereby assume the responsibility of liquidating my account prior to the accrual of losses in excess of the amounts of margin I may elect from time to time to deposit with you, plus the amount of gains then accrued to the open positions in my account; any losses in excess of such total shall be solely your responsibility * * * .

If the foregoing correctly sets forth your understanding * * * , please indicate such by executing the enclosed copy * * *

The understanding was accepted by Sidney Samuels on behalf of First Western.[31]

### Maule

Mr. Maule is an officer and principal owner of a furniture manufacturing company. Mr. Maule was introduced to the First Western program by Dave Kobsev, about whom he knew virtually nothing. He understood that a $100,000 loss could be realized in 1980, the account would be "neutralized" in 1980—i.e. "I would not be at risk," and a capital gain would be reported in 1982. In Mr. Kobsev's presentation of a "worst case" situation involving First Western transactions, there was no indication that Mr. Maule could lose more than his original margin, and Mr. Maule believed that his potential loss was so limited.

For the taxable year 1980, Mr. Maule requested a $100,000 ordinary loss. On June 23 and 27, 1980, a series of forward contract transactions were entered into that culminated in one $4,200,000 contract being canceled with a $117,642 loss. That loss was deducted on Mr. Maule's 1980

---

[31]Compare Mr. Freytag's testimony:

QUESTION: At the time you invested in the 1978 program that the most you could lose would be the amount of cash you put up?
ANSWER: [Mr.Freytag]: So that the margin was the limitation on my losses?
QUESTION: Right.
ANSWER: No.

Mr. Freytag explained that he viewed his 1978 letter as "a stop loss order." That letter, however, was explicit—"any losses in excess of * * * [the margin plus gains] shall be solely your responsibility."

return. On July 7, 1980, two weeks after the initial transactions, First Western deposited a check from Mr. Maule in the amount of $13,000.

In 1981, a request was made for a loss of $100,000. Mr. Maule's statement showed that the value of his account on February 27, 1981, was $5,719. Nonetheless, by letter dated March 2, 1981, First Western wrote to Mr. Maule advising that "your account requires an additional margin of $7,300. Please send us a check for the above amount by June 1, 1981." By a series of forward contract transactions, on March 3, 1981, Mr. Maule's account showed a loss of $106,848 by cancellations that Mr. Maule deducted as an ordinary loss on his 1981 return. First Western records show that the account was "neutralized" on March 23, 1981. On April 30, 1981, the account had a value of $3,721. On May 13, 1981, First Western wrote a virtually identical letter to the March 3 letter requiring a $7,300 "margin" deposit. On May 28, 1981, First Western received a check for $7,300. Mr. Maule admitted that when the facts are examined "In retrospect, it very well could have been" that the margin call was for the 1981 tax "writeoff."

### McCoin

Mr. McCoin is a investment banker who, through three entities, was involved with the First Western program. McCoin owned a 50-percent interest in Mosher, McCoin & Sims (Mosher), a joint venture that has the attributes of a partnership for tax purposes. Mosher entered into a customer's agreement with First Western in June 1980. First Western's records show that a request was made for a $100,000 ordinary loss in 1980 and a $100,000 long-term capital gain for 1982. On June 24, 1980, First Western established a straddle in First Western's GNMA forward contracts for Mosher. On June 27, 1980, contracts were canceled with a loss of $102,272. On July 11, 1980, First Western received an "interest forecast" and a check for $10,000. McCoin deducted his aliquot part of this loss on his 1980 return.

In 1982, after other transactions in 1980 and 1981, Mosher "assigned" its remaining contracts to Ionian. By letter dated March 25, 1982, First Western acknowledged

Mosher's assignment request as of March 10, 1982, and requested that Mosher execute and return an assignment agreement. Apparently, Mosher failed to execute the agreement and, on September 13, 1982, First Western wrote to Mosher and again requested an executed assignment agreement. A form assignment, dated March 10, 1982, was executed at some point in time by which Mosher "assigned" its remaining contracts to Ionian. Mosher had a $90,822 profit on the assignment, and McCoin reported a long-term capital gain on his 1982 return.

McCoin, however, had two other contacts with First Western. First, he was a partner in Money Managers Joint Venture (MM). MM was formed on November 20, 1980. On December 2, 1980, MM entered into an agreement with First Western. First Western received a request for an ordinary loss of $523,000 for 1980, and a $523,000 long-term capital gain in 1982. On December 10, 1980, MM entered into a straddle of First Western's forward contracts for GNMA's. On December 11, 1980, contracts were canceled with a loss of $388,674. Also, on that date, First Western received checks in the amount of $40,500. One check for $9,000 was returned for insufficient funds. The amounts of these checks correspond generally to the contributions of capital in MM required by the agreement. Before December 31, 1980, First Western received an additional $44,750 in checks—one of which for $3,000 was returned for insufficient funds. The checks that were returned apparently were never made good. Again these checks correspond to the agreed capital contributions in the partnership agreement. McCoin deducted $59,706, his aliquot share of MM's loss, on his 1980 tax return. Another series of First Western forward contracts transactions culminated in a net loss of $141,979, and McCoin deducted a net loss of $16,759 on his 1980 return. MM's total payment, after allowance for returned checks, was $73,250, and the total "trading" loss was $530,653. For the year 1981, MM requested an ordinary loss of $260,000 with a long-term capital gain in 1983 in the same amount. MM recognized a loss of $268,713 from cancellations in 1981, and McCoin deducted his share of the loss. In 1982, MM "assigned" contracts to Ionian on March 10, 1982, and its First Western account was credited

with $801,719. By letter dated March 25, 1983, First Western advised MM that its gain was $609,047, and McCoin reported a long-term capital gain of $94,631. He also reported an ordinary loss of $4,634 and ordinary income of $199.

McCoin's other connection with First Western was Mosher, McCoin & Sims, Inc. (the corporation), of which he is an owner and an employee. The corporation holds itself out as an "independent investment advisor under the provisions of section 203 of the Investment Advisors Act of 1940." During the years in question, the corporation was paid around $600,000 by First Western for putting its customers in First Western programs. The corporation prepared various presentations of the First Western program for its customers in which it was pointed out that, even if the customer lost his entire margin, he would make a profit from tax savings. The following statement was made by the corporation: "Cash deposit 17% of writeoff should expect to lose all of cash deposit any profit left at end of transaction is 'gravy.'" There is no mention in any of the corporation's materials that a customer could lose more than his payments to First Western. Mosher, McCoin & Sims had reviewed a pamphlet prepared apparently in 1978 by First Western (Samuels & Co.) that provided, inter alia:

One time margin equal to 10% of the tax write-off * * * .

       *     *     *     *     *     *     *

No other cash or margin deposits are required.

       *     *     *     *     *     *     *

If customer is correct in his interest rate direction, he will receive a check from First Western in an amount of up to 60% of his initial margin * * * . Note that the tax write-off could be as high as 25 to 1.

ULTIMATE CONCLUSIONS OF FACT

(1) The transactions between First Western and its customers were illusory and fictitious and not bona fide transactions.

(2) Even if the transactions were bona fide transactions, the transactions were entered into primarily, if not solely, for tax-avoidance purposes.

(3) Petitioners claiming deductions based on these transactions are liable for additions to tax under section 6653(a).

OPINION

1. *The transactions were not bona fide.*

Section 165(a) allows deductions for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Deductions, in the case of an individual taxpayer, are limited, inter alia, to "loss[es] incurred in a trade or business" and "loss[es] incurred in any transaction entered into for profit, though not connected with a trade or business." The regulations provide that "To be allowable as a deduction * * * , a loss must be evidenced by a closed and completed transaction * * * . Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Sec. 1.165-1(b), Income Tax Regs.

In examining the tax aspects of straddles of futures or forward contracts for commodities or for financial instruments, this Court has observed two situations. In those cases where the transactions take place on regulated markets, our attention has focused on the profit motive of the participant. E.g., *Smith v. Commissioner*, 78 T.C. 350, 390-394 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987); *Fox v. Commissioner*, 82 T.C. 1001 (1984). On the other hand, where the market is limited to transactions between the straddle customers and the maker of that market, referred to herein as "off market,"[32] we have focused first on whether the purported transactions existed in substance and were not merely a paper trail for tax deductions. E.g., *Forseth v. Commissioner*, 85 T.C. 127 (1985), affd. 808 F.2d 1219 (6th Cir. 1987), affd. 810 F.2d 197 (5th Cir. 1987), affd. 813 F.2d 293 (9th Cir. 1987), affd. 800 F.2d 266 (11th Cir. 1986); *Brown v. Commissioner*, 85 T.C. 968 (1985), on appeal (9th Cir., Jan. 5, 1987, and Mar.

---

[32]By using the term "off market" we are not referring to over-the-counter markets. Rather, we are referring to alleged markets where prices are not quoted to the public.

23, 1987). This latter question is primarily factual. *Mahoney v. Commissioner,* 808 F.2d 1219, 1220 (6th Cir. 1987), affg. 85 T.C. 127 (1985); *Enrici v. Commissioner,* 813 F.2d 293, 295 (9th Cir. 1987), affg. 85 T.C. 127 (1985). We have had before us several recent cases involving "off market" transactions of Government securities or commodities. See *Forseth v. Commissioner, supra; Brown v. Commissioner, supra; Price v. Commissioner,* 88 T.C. 860 (1987). In those three cases we found that the purported transactions were "factual shams" (*Forseth v. Commissioner,* 85 T.C. at 165; *Brown v. Commissioner,* 85 T.C. at 1000), and "fictitious, i.e., shams" (*Price v. Commissioner,* 88 T.C. at 883). In making this determination, we considered various factors such as: (1) The correlation of tax needs and the purported losses, (2) the use of "margin" requirements, (3) the methods by which the "transactions" were closed, (4) the manipulation of trading records, (5) the fact that the "dealer" was on two sides of the transaction and could execute the "transactions" at will, (6) the use of pricing formulae, and (7) the viability of the dealer's "hedging" program.

More than half of the transcript in this case involves expert testimony concerning the theoretical viability of First Western's program as a bona fide investment strategy and the reasonableness of its prices for forward contracts. In many instances, we have no reason to doubt the general testimony of petitioners' experts. On the other hand, we are left with the very firm impression that petitioners' expert witnesses were either not given the total facts or ignored many of the gremlins in the First Western program. There, perhaps, is not a single salient gremlin that alone leads us to conclude that the transactions of First Western's world were illusory and fictitious. Rather, it is the cumulation of simply too many gremlins.

### Risk of Profit and Loss

First Western was continually on all sides of these transactions. In a transaction involving the purchase or sale of forward contracts, First Western was on the opposite side, it was the market maker and it represented purchaser or seller—its customer. First Western also established the

prices. Furthermore, at will, it could change positions in the portfolios. These aspects may not be necessarily fatal to the alleged bona fides of these transactions, but they do cause misgivings, particularly where only approximately 3 percent of the accounts made money, and of this group, First Western employees were the largest winners.[33]

Petitioners presented voluminous expert testimony on the profit potential of the program. But what concerns us is that, if the profit potential was not a legerdemain, why were potential losses of customers limited to the amount of margin payments.[34] In short, we are asked to believe that, while customers' losses were limited, their profits were unlimited. The wearing of judicial robes does not require that we take leave of commonsense. If First Western controlled losses by its system, that system also would have to control profits, and, as Mr. Taylor's letter to Dr. Womble indicates, First Western could fine-tune its program to reach any result.

Petitioners' portfolios were constructed so as to achieve their desired tax losses. In this regard, the most important required data supplied by petitioners were their requested tax losses. Indeed, the program could not be implemented without the tax information. Thus, in analyzing the program from a profit standpoint, from the first, the tax tail wagged an economic dog. Furthermore, First Western's uncanny ability to produce almost precise tax results belies the image that the program was not capable of carefully controlling results.

Petitioners rely on the fact that certain customers, other than First Western employees, did make money, to argue that the potential for profit, therefore, was real. We believe, however, that the few cases where customers received more than they put in were simply "window dressing." Even in so-called "Ponzi" schemes there are some winners. See *Murphy v. Commissioner,* 661 F.2d 299 (4th Cir. 1981), affg.

---

[33]At trial there were objections by petitioners to the testimony concerning First Western's employees as winners. We first note that we requested that the parties brief the issues. Petitioners have not addressed these objections on brief and, therefore, we assume that the objection is waived. Furthermore, after a review of these objections, we believe that they are without merit.

[34]First Western employees testified that there was no such agreement with customers. Petitioner Freytag's letter to First Western and First Western's pamphlet to McCoin put an end to that charade.

a Memorandum Opinion of this Court. But that fact does not give any economic substance to the scheme.

## Hedging

Also crucial to First Western's image as a market "dealer" was its alleged hedging system. First Western allegedly maintained a hedging account with Conti. But we find little, if any, correlation between that account and First Western's alleged risk exposure through its forward contracts. Indeed, on at least one occasion, First Western "hedged" the wrong way. Putting aside First Western's method of computing its risks, which is in itself suspect, not even petitioners' primary expert on hedging would conclude that the hedging program was operated in a manner that was consistent with sound business practices.[35] Needless to say, respondent's expert witnesses were even less enthusiastic concerning the sound business practice of First Western's hedging program. We recognize that bona fide dealers may make a decision to be exposed by not being fully hedged. But in those situations, there is a conscious decision by management to take such a risk. Here the risk was already controlled, and First Western's account with Conti was not a bona fide hedging account.

## Margins and Fees

First Western's methods of using margins and collecting fees, when compared with normal practice, can only be characterized as bizarre. Essentially, the amount of the margin was determined by the tax loss requested. It was not a good-faith deposit to protect a dealer against loss. Rather, it was the source from which fees were charged. First Western's internal documents show that fees were budgeted or deducted from the margin accounts prior to any trading activity, and, when the "fee cap" was reached, no further fees were collected regardless of the number of subsequent transactions. Furthermore, as we have found,

---

[35]Petitioners' expert later expressed the view that in light of First Western's capital structure in March 1981 of $17 million, First Western's risk was not unacceptable. While at that particular time the risk compared to capital might have been reasonable, that does not explain the reasonableness of the risk before and after that period when the capital was substantially less and the risk exposure just as great. We do not find this latter testimony persuasive. Even a blind squirrel may find a nut now and then.

the amount of the margin limited the customers' potential losses. Finally, even when "margin calls" were made, they were frequently ignored, except when another program for the next year was started, and then the "margin calls" were, as Mr. Maule recognized, nothing more than a device used to implement the subsequent year's "tax preference."

## Pricing

An enormous amount of testimony of the experts focused on the prices of First Western's forward contracts. One aspect of the pricing is clear—the prices were artificially generated by the pricing algorithms. This point is not in dispute. Petitioners contend, however, that even if the prices are artificially generated, they should be recognized as "valid" because they closely approximated market prices.

Here, not unlike Macduff, we were "Laid on." Petitioners introduced a vast amount of testimony and studies tending to show that First Western's prices were reasonable. These studies were primarily based on regression analyses to produce standard deviations between First Western's prices and the Telerate and/or Wall Street Journal prices. Respondent's experts, on the other hand, primarily based their studies on absolute price differences between First Western generated prices and the Telerate and/or Wall Street Journal prices. We are persuaded that respondent's analyses are more meaningful. A brief example is sufficient to illustrate our reasoning. If there are two observations of price differences, one of which is $10 too high and the other $10 too low, the standard deviation (or "$r^2$") would be zero, suggesting that First Western's pricing was accurate, even though there are vast differences in the prices. In short, in a standard deviation analysis, overpricing by the algorithm is offset by underpricing. Accordingly, we find that the absolute (or mean absolute) difference analyses by respondent more accurately reflect the reasonableness of First Western's prices.

Without going through each study, one of the most significant aspects revealed is that the algorithm systematically overpriced lower coupons and underpriced higher coupons. (Indeed, petitioners' evidence confirms this aspect of the pricing algorithms, although the price differences are

not as dramatic under petitioners' regression analyses.) Furthermore, respondent's analyses of First Western pricing showed, inter alia, cash price differences for coupons priced using First Western's algorithm and Telerate historical prices as large as $6.73, and in 580 cases (24 percent of the observations) the differences were $4 or more. A comparison of First Western generated prices and Telerate prices for 1- through 4-month forward contracts was equally off the mark.

These differences are highly significant. Given the enormous legs of the straddles, if one leg is overpriced or underpriced, the gain or loss may be clearly controlled. Having written the pricing algorithms, First Western surely understood their mathematical properties, and, therefore, could, and did, utilize its prices to obtain any result it desired. This certainly is consistent with the bizarre operations of the so-called hedging account and First Western's ability to limit losses. It also explains the reason that First Western could not, and did not, quote prices to bona fide dealers. In a sentence, if it had, it would have been arbitraged out of existence by a dealer purchasing or selling at these prices and taking the opposite position in the cash market.[36]

### Closing the Transactions

Petitioners used three methods of closing its customers' transactions—cancellation, setoff, and assignments. We are primarily concerned with the use of cancellation and assignments, since these devices were used by First Western to create the tax benefits its customers sought. As we have found, First Western's uses of these devices were far different from those in the "real world."

The manner in which the assignments were effected also reveals the nature of these transactions. The customer "assigned" his contracts to one of the three assignees. In essence, his account was credited with approximately 99 percent of the net value of the contracts. The assignee's account was credited with the full value of the contracts and debited by the amount paid to the assignor. First

---

[36]While there was a sharp dispute as to the appropriate band of arbitrage—viz, when the spread between prices is arbitragable—differences of over $2 clearly fall without that band.

Western then canceled or set off the contracts and paid the assignee approximately 1 percent of full value. There was no negotiation over prices at the time of the assignments, cancellations, or setoffs. The prices were set by First Western all the way through, even though the assignees were allegedly purchasing the contracts that provided for delivery to or from the customers. There is clearly more than a touch of whimsy in these transactions.

There are also other gremlins in First Western's program that dispel the notion that these transactions were bona fide—e.g., reversing transactions months later, assignments and confirmations being sent months after the transactions allegedly took place, margin demands not being satisfied, transactions being entered into without any documented correspondence with the customer or his representative, etc. While petitioners' experts have attempted to cast some of these facts in terms of "normal market" glitches, we are not persuaded. Perhaps, taken in isolation, there may be some validity to the explanations, but, taken together, First Western's operation could not have existed if there had been any real economic substance to its program. In short, petitioners ignore what happened and depend on a theoretical justification of what did not happen. First Western's world consisted of a computer spitting out paper showing huge transactions that had no economic significance except in petitioners' attempts to raid Federal and State fiscs.

2. *Even if there were bona fide market transactions, those transactions were not entered into primarily for economic purposes and are not recognized for Federal tax purposes.*

While we could stop here, there is an alternative basis for rejecting petitioners' claims. Section 165(c)(2) permits individuals to deduct losses incurred in any transaction entered into for profit. In *Glass v. Commissioner,* 87 T.C. 1087 (1986), we discussed in detail the background that gave rise to the theoretical basis for favorable treatment of trading straddles, and we will not repeat that discussion here. We summarized our views as follows (87 T.C. at 1175):

Section 165 allows as a deduction any loss sustained during the taxable year and not compensated by insurance or otherwise. Section 1234 determines the character of gains and losses attributable to option

transactions, including commodity options. New section 108(a) allows losses sustained by investors in straddle transactions if incurred in a transaction entered into for a profit. * * *

"New section 108(a)" refers to section 108 ("old section 108") of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630), as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817.

Prior to section 108 of the 1984 Act ("old section 108"), the Court had found that there were not any non-tax profit objectives in transactions involved in so-called "butterfly" straddles and held that the taxpayers did not have "the requisite economic profit objective necessary to enable them to deduct the commodity tax straddle losses" under section 165(c)(2). *Smith v. Commissioner,* 78 T.C. at 394. Subsequently, we held that under section 165(c)(2) the proper test was whether the taxpayer's "primary" motive was economic, except where the "transactions * * * are unmistakably within the contemplation of congressional intent" to encourage such investments. *Fox v. Commissioner,* 82 T.C. at 1021.

We next considered the effect of "old section 108" in *Miller v. Commissioner,* 84 T.C. 827 (1985), on appeal (10th Cir., Nov. 20, 1985). In *Miller,* we recognized that the transactions were "primarily tax motivated." 84 T.C. at 837. Nonetheless, the Court held that section 108(a)[37] "directs that losses be allowed on the disposition of a position if that particular straddle transaction can be said to have held 'a reasonable prospect of any profit' at the time the straddle was acquired." 84 T.C. at 842.

---

[37]SEC. 108(a). GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

    (1) which were entered into before 1982 and form part of a straddle, and

    (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981, do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.

    (b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

    [Tax Reform Act of 1984, Pub. L. 98-369, sec. 108, 98 Stat. 630.]

Section 1808(d) of the 1986 Act[38] amended "old section 108." In *Glass v. Commissioner,* 87 T.C. at 1167, we summarized the amended version of section 108:

In summary, then, amended section 108 traces the pattern of the loss provisions of section 165(c)(1) and (2), and makes it clear that losses incurred by commodities dealers trading in commodities are deductible under section 108 since they are losses incurred in a trade or business. Investors, on the other hand, must meet the test of loss incurred in a transaction entered into for profit. In the context of commodity straddle transactions, the investor language parallels the section 165(c)(2) language which we construed in *Smith* and *Fox,* and (except as to commodities dealers) we think the effect of amended section 108 is to revalidate our holdings in those cases.

The initial question that arises under our holdings in *Smith* and *Fox* is whether these transactions were "unmistakably within the contemplation of congressional intent" for affording special tax consideration. Even if we were to accept petitioners' view of this program (which we do not), the economic raison d'etre for these transactions was to permit the customers to speculate on interest rates. But rank speculation is generally not considered the type of

---

[38]Sec. 1808(d) of the Tax Reform Act of 1986 amended sec. 108 as follows:

(d) SECTION 108.—Section 108 of the Tax Reform Act of 1984 is amended—

(1) by striking out "if such position is part of a transaction entered into for profit" and inserting in lieu thereof "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business",

(2) by striking out subsection (b) and inserting in lieu thereof the following:

"(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.",

(3) by striking out the heading for subsection (c) and inserting in lieu thereof the following: "(c) NET LOSS ALLOWED.—",

(4) by striking out subsection (f) and inserting in lieu thereof the following:

"(f) COMMODITIES DEALER.—For purposes of this section, the term 'commodities dealer' means any taxpayer who—

"(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or

"(2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of—

"(A) 1 or more individuals described in paragraph (1), and

"(B) 1 or more members of the families (as so defined) of such individuals.", and

([5]) by striking out subsection (h) and inserting in lieu thereof the following

"(h) SYNDICATES.—For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1954) shall not be considered to be a loss incurred in a trade or business."

[Sec. 1808(d), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817-2818.]

investment that Congress has sought to foster, and petitioners have not shown us expressions of congressional intent to encourage investments of this nature. Furthermore, we doubt seriously that Congress would ever encourage a speculative device where the primary by-product is to shift income from one year to another. Thus, under the *Smith* and *Fox* analyses, petitioners must show that their primary motivation in entering into these transactions was economic profit.

Petitioners urge that there was a profit potential here as evidenced by the fact that some of the petitioners actually made money. But the fact that there may have been winning participants does not answer the question whether the transactions were primarily entered into for profit. While the petitioners testified that their primary motive or intent was to make a profit, the documents and the parties' actions direct a different conclusion.

Petitioners focus upon First Western's promotional material and point out that the tax consequences are not mentioned. From this we are asked to minimize the role that tax considerations could have played in its customers' decisions to invest in its program. First, it is quite clear from the 1978 pamphlet given to McCoin that First Western always emphasized the perceived tax advantages. Furthermore, the promotions of the so-called finders paint an entirely different picture. In that picture, the economic potential is described by one finder as the "gravy," and generally there was no discussion of economic gain. It was generally assumed that a customer would lose most, if not all, of his payment. Clearly, the program was sold because of its perceived tax advantages, with little or no emphasis on the economic potential.

This conclusion is reinforced by the manner in which petitioners regarded these transactions with First Western. Few, if any, petitioners had the slightest idea of the operations of the program. Dr. Womble did not even understand what he had allegedly bought and sold. Few, if any, petitioners ever attempted to check prices or could even determine whether their "interest forecast" was implemented. On the other hand, all of the petitioners and their finders were acutely aware of the perceived tax benefits and

the finders' analyses of potential success of the program was based on the tax benefits. Indeed, Col. Harby was so focused on the tax benefits that he eschewed a $30,000 profit to increase a tax loss.

In short, it is simply ludicrous to suggest that these petitioners had anything but a most fleeting interest in a potential economic gain. Thus, even if the transactions were market transactions, this program was driven almost exclusively, and certainly primarily, by tax considerations. Accordingly, under our holdings in *Smith*, *Fox*, and *Glass*, petitioners may not deduct these losses under the applicable loss provisions of the Internal Revenue Code.

3. *Deductions for amounts paid to First Western and to the "finders," and inclusion in income of "profits."*

Petitioners who claimed deductions for investment services have not shown that the amounts deducted were for services other tha those related to First Western transactions. The amounts paid to First Western and to the various finders were paid to purchase perceived tax deductions and are not deductible under section 162 or section 212. *Brown v. Commissioner*, 85 T.C. at 1000, and cases cited therein. The gains from First Western forward contract transactions reported in other years, as with the losses, are not recognized for tax purposes. To the extent, however, that any petitioners received more from First Western than they paid to First Western during the years before the Court, the excess is ordinary income. *Murphy v. Commissioner*, 661 F.2d 299 (4th Cir. 1981), affg. T.C. Memo. 1980-218.

4. *Section 6621.*

Section 6601 provides that "if any amount of tax * * * is not paid on or before the last date prescribed for payment, interest * * * [as determined by section 6621] shall be paid for the period from such last date to the date paid." Section 6621(a)(2) provides the general rule that the rate of interest for underpayments shall be the "short-term Federal rate" plus "3 percentage points." In the case, however, of a "substantial underpayment attributable to tax motivated transactions" shall be 120 percent of the rate under section

6621(a)(2). Sec. 6621(c)(1). A "substantial underpayment" is an underpayment exceeding $1,000 attributable to one or more "tax motivated transactions." Sec. 6621(c)(2). "Tax motivated transactions" are defined, inter alia, as "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). We have found that these transactions were illusory and fictitious, i.e., shams. Accordingly, the underpayments resulting from the losses and related deductions claimed on petitioners' returns are attributable to tax-motivated transactions and the interest on these underpayments shall be computed under section 6621(c)(1).

### 5. Negligence.[39]

Section 6653(a) provides that if any part of an underpayment "is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment." Petitioners have the burden of proving that their actions in claiming these losses were not negligent. *Forseth v. Commissioner*, 85 T.C. at 166.

"Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964); T.C. Memo. 1964-299, cert. denied 389 U.S. 1004 (1968); *Zmuda v. Commissioner*, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

In these cases, all petitioners had backgrounds and knowledge that should have alerted them to the fact that something was wrong with First Western's program. While their vocations varied, all petitioners had some business and/or investment background, and there were clearly sufficient gremlins that would have required a reasonably prudent person to step back and take another look. We do not find any attempt by petitioners Ames, Timm, Poulous, Lewis, and Womble to take even the most elementary steps to investigate. They were told about the perceived tax advantages that, especially when compared with the payment, were enormous. As we have noted in our findings of

---

[39]Additions to tax under sec. 6653(a) were determined against petitioners Freytag, Timm, Poulous, Lewis, Ames, Womble, and McCoin.

fact, these petitioners then entered into the alleged transactions with little or no understanding of what they were doing, even though, if we accept the literal terms of the forward contracts, they could be required to make or receive delivery of millions of dollars of GNMA's and FMAC's. Furthermore, this was during a period of time when, as the Ninth Circuit has observed, there was "extensive continuing press coverage of questionable tax shelter plans." See *Zmuda v. Commissioner,* 731 F.2d at 1422, and references cited therein.

Petitioners Ames, Poulous, Timm, Lewis, and Womble, however, contend that they satisfied the reasonable and prudent person standard by relying on the advice of their investment counselors. We are not persuaded. While there are situations where reliance on expert advice may satisfy this standard, these petitioners do not fall within that rationale. Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. First, it must be established that the reliance was reasonable. There is no showing that petitioners were negligent in relying on the advice given by attorneys or certified public accountants with respect to the tax consequences of the transactions at issue if they had substance. However, there is also no showing that petitioners consulted any experts with respect to the bona fides of the financial aspects of the transactions. One of the attorneys (Mr. Taylor) giving tax advice specifically testified that he was "no expert" on such matters, and we believe that, if he had known the facts, he would not have given the advice that he did. Moreover, his client testified that he had no knowledge that Mr. Taylor had experience or expertise in this area. Similarly, while Mr. Burns was a CPA, he had no market experience upon which to base an opinion that Mr. Ames could reasonably rely on. There is nothing in the record to indicate that Messrs. Neese or Schmidt had any expertise in this area. Taking into account the novel nature of First Western's program and the huge tax writeoffs, we believe further investigation was mandated.[40] See *Saviano*

---

[40]Messrs. Taylor and Burns testified that they solicited the views of other professionals concerning First Western. We do not know, however, if this was communicated to their clients, nor do we know the particular expertise of the persons contacted.

*v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). We also recognize that many people make investments on the touts of even strangers, but, simply because many people do, does not establish reasonable and prudent conduct. In short, if there had been any real examination of the program, "No reasonable person would have expected this scheme to work." Compare *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court. Accordingly, petitioners Ames, Timm, Poulous, Lewis, and Womble have not carried their burden of proof on this issue.

All that we have said also applies to Messrs. Freytag and McCoin; however, both petitioners face additional problems. Mr. Freytag, while perhaps not professionally concentrating on the tax aspects of securities transactions, certainly was no stranger to the tax laws. He was informed about First Western by some of his law partners and allegedly "did some research as to the investments." He knew that the so-called "margin" was a charade. The only conclusion that is possible on this record is that Mr. Freytag knew that First Western's program was controlled to the point that any meaningful risk was virtually nonexistent, and, therefore, these could not have been bona fide transactions. Nonetheless, he filed returns claiming losses based on this program. Warning bells tolled, but he ignored them. Mr. Freytag's actions were, at the very least, negligent.

Mr. McCoin's situation is somewhat similar. Mr. McCoin has degrees in finance and economics. He also knew that any risk was limited to the "margin" and that the "margin" was geared to the tax loss requested. Thus, he must have known that First Western's program depended on controlled results with only a vague reference to market forces. As with Mr. Freytag, with Mr. McCoin's background, the warning bells surely rang loud and clear and he ignored them. Both had to know that the investment was simply too good to be valid taxwise.

6. *Section 6673 and Rule 33(b).*

Section 6673 provides that if "it appears to the Tax Court * * * that the taxpayer's position in * * * proceedings is frivolous or groundless, damages in an amount not

in excess of $5,000 shall be awarded to the United States."
In *Brown v. Commissioner,* 85 T.C. at 1002, while we
eschewed awarding damages, we stated:

We hereby serve notice, however, that henceforth we will have no
reluctance with respect to petitioners who file petitions or maintain
positions based upon transactions which they knew or reasonably should
have known to be factual shams.

We have found, inter alia, that the transactions here were
essentially illusory and fictitious, similar to those in *Brown,*
and we are tempted to award damages. As discussed in the
previous section of this opinion, there clearly were warning
bells that any reasonable and prudent person should have
heard. In the exercise of our discretion, however, we will
again eschew awarding damages even though these cases
are nothing more than variants of *Brown.*

There are, however, other groups of cases involving
similar types of transactions that may fall either within the
factual patterns of this case and *Brown* or the *Glass* case.
We serve notice, therefore, that the cases addressed in this
opinion are the last free bites of that apple.

We also caution future counsel that Rule 33(b) provides:

The signature of counsel or a party constitutes a certificate by him that
he has read the pleading; that, to the best of his knowledge, information,
and belief formed after reasonable inquiry, it is well grounded in fact and
is warranted by existing law or a good faith argument for the extension,
modification, or reversal of existing law, and that is not interposed for
any improper purpose, such as to harass or to cause unnecessary delay or
needless increase in the cost of litigation. * * * If a pleading is signed in
violation of this rule, the Court, upon motion or upon its own initiative,
may impose upon the person who signed it, a represented party, or both,
an appropriate sanction, which may include an order to pay to the other
party or parties the amount of the reasonable expenses incurred because
of the filing of the pleading, including reasonable counsel's fees.

We are aware that sometimes a client may insist that a
case be litigated even when the chances of success are
virtualy nonexistent. But counsel also owes a duty to this
Court. See rule 3.1, A.B.A Model Rules of Professional
Conduct and Code of Judicial Conduct (Aug. 1983 ed.). If
tension exists between that duty and a client's insistence on

litigating unmeritorious claims, counsel must evaluate Rule 33(b). Compare *Kalgaard v. Commissioner*, 764 F.2d 1322, 1324 (9th Cir. 1985), affg. a Memorandum Opinion of this Court.

*Decisions will be entered under Rule 155.*[41]

---

## APPENDIX

1. The deficiencies in these cases are as follows:

| | | | Deficiencies | |
| --- | --- | --- | --- | --- |
| Docket No. | Petitioners | TYE Dec. 31— | Tax | Sec. 6653(a) |
| 4934-82 | Thomas L. and | 1978 | $35,269.80 | $1,763.49 |
| | Sharon N. Freytag | 1979 | 51,101.00 | 2,255.05 |
| 9307-82 | Bert C. and | 1978 | 17,556.00 | 878.00 |
| | Mildred H. Timm | 1979 | 15,544.00 | 777.00 |
| | | 1980 | 43,518.00 | 2,176.00 |
| 27146-82 | Horace D. and | | | |
| | Sandra S. Harby | 1979 | 10,840.60 | - - - |
| 29012-82 | Ernest and | 1978 | 73,040.00 | 3,589.00 |
| | Joyce Poulos | 1979 | 100,447.00 | 5,022.00 |
| | | 1980 | 84,347.00 | 4,206.85 |
| 1240-83 | Littleton G. Lewis, Jr., | 1979 | 8,712.00 | 429.00 |
| | and Irene R. Lewis | 1980 | 11,482.00 | 574.00 |
| 3250-83 | Joe D. and | | | |
| | Gladys E. Womble | 1980 | 23,334.52 | 1,166.73 |
| 8616-83 | Gerald T. and | | | |
| | Charlene K. Maule | 1980 | 59,208.00 | - - - |
| 33016-83 | Horace D. and | 1980 | 27,684.07 | - - - |
| | Sandra S. Harby | 1981 | 9,318.00 | |
| 204-84 | Gerald T. and | | | |
| | Charlene K. Maule | 1981 | 35,895.00 | - - - |
| 3749-84 | Thomas L. and | | | |
| | Sharon N. Freytag | 1980 | 49,946.00 | 2,497.00 |
| 7658-84 | B. Charles and | 1979 | 1,028,973.70 | 51,448.69 |
| | Joyce G. Ames | 1980 | 110,994.10 | 5,549.71 |
| 11821-84 | Kenneth G. and | | | |
| | Candace G. McCoin | 1980 | 52,836.44 | 2,641.82 |

---

[41]While Rule 155 computations may be unnecessary in some cases, it is unclear to us whether the parties are in agreement. Accordingly, we will let the parties sort out these problems, if any.

2. At the time of filing their petitions, petitioners resided as follows:

| Petitioners | Place of residence |
|---|---|
| Thomas L. and Sharon N. Freytag (Freytag) | Dallas, Texas |
| Littleton G., Jr., and Irene R. Lewis (Lewis) | Greenville, South Carolina |
| Horace D. and Sandra S. Harby (Harby) | Clemson, South Carolina |
| Ernest and Joyce Poulos (Poulos) | Dallas, Texas |
| Bert C. and Mildred H. Timm (Timm) | Plano, Texas |
| Joe D. and Gladys E. Womble (Womble) | Arlington, Texas |
| Gerald T. and Charlene K. Maule (Maule) | Tacoma, Washington |
| B. Charles and Joyce G. Ames (Ames) | Shaker Heights, Ohio |
| Kenneth G. and Candace G. McCoin (McCoin) | Houston, Texas |

3. Petitioners filed income tax returns claiming deductions attributable to transactions with First Western that respondent disallowed as follows:

| Petitioner | Year | Claimed deductions | |
|---|---|---|---|
| Freytag | 1978 | $70,739.00 | Ordinary loss from cancellations |
| | 1979 | 99,403.00 | Ordinary loss from cancellations |
| | | 6,303.00 | Net short-term capital loss from offsets[42] |
| | 1980 | 101,794.00 | Ordinary loss from cancellations |
| Poulos | 1978 | 152,359.00 | Ordinary loss from cancellations |
| | | 7,500.00 | Investment counsel fee to Interplan, Inc. |
| | 1979 | 183,416.00 | Ordinary loss from cancellations |
| | | 2,000.00 | Investment advisory fee |
| | | 10,500.00 | Investment counsel fee to Interplan |
| | 1980 | 167,244.00 | Ordinary loss from cancellations |

[42]Only $3,000 of this amount was used in 1979 because of the limit on the use of capital losses.

| Petitioner | Year | Claimed deductions | |
|---|---|---|---|
| | | $7,500.00 | Investment counsel fee to Interplan |
| Timm | 1978 | 50,476.24 | Ordinary loss from cancellations |
| | | 2,500.00 | Investment counsel fee to Interplan |
| | 1979 | 12,633.00 | Net short-term capital loss from offsets · |
| | | 1,000.00 | Investment counsel fee to Interplan |
| | | 5,000.00 | Investment advisory fee |
| | 1980 | 62,004.00 | Ordinary loss from cancellations |
| | | 77,611.00 | Net short-term capital loss from offsets |
| | | ·844.00 | Investment advisory fee to Samuels-Kramer |
| | | 6,750.00 | Investment counsel fee to Interplan |
| Ames | 1979 | 2,029,934.00 | Ordinary loss from cancellations |
| | | 2,000.00 | Investment advisory fee to Samuels-Kramer |
| | 1980 | 146,395.00 | Ordinary loss from cancellations |
| Harby | 1979 | 54,777.00 | Ordinary loss from cancellations |
| | 1980 | 76,624.00 | Ordinary loss from cancellations |
| | | 581.00 | Net short-term capital loss from offsets |
| | 1981 | 33,798.00 | Ordinary loss from cancellations |
| Lewis | 1979 | 49,305.00 | Ordinary loss from cancellations |
| | | 300.00 | Investment advisory fee |
| | 1980 | 37,768.00 | Ordinary loss from cancellations |
| | | 529.00 | Net short-term capital loss from offsets |
| | | 1,600.00 | Investment advisory fee |
| Maule | 1980 | 117,642.00 | Ordinary loss from cancellations . |
| | 1981 | 106,848.00 | Ordinary loss from cancellations |
| Womble | 1980 | 47,367.33 | Ordinary loss from cancellations |
| McCoin | 1980 | 113,771.00 | Ordinary loss from cancellations |