**PURSUANT TO INTERNAL REVENUE CODE SECTION 7463(b),THIS OPINION MAY NOT BE TREATED AS PRECEDENT FOR ANY OTHER CASE.**

T.C. Summary Opinion 2013-62

UNITED STATES TAX COURT

SEAN MCALARY LTD, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21068-11S.            Filed August 12, 2013.

Sean P. McAlary (an officer), for petitioner.

<u>Mark H. Pfeffer</u>, for respondent.

SUMMARY OPINION

GUY, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions

of section 7463 of the Internal Revenue Code in effect when the petition was

filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

The petition in this case was filed in response to a notice of determination of worker classification (notice of determination) issued to Sean McAlary Ltd, Inc. (petitioner), pursuant to section 7436.  The notice of determination concerns employment tax liabilities arising under the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) for quarterly periods ending in 2006.[2]  Attached to the notice of determination is a schedule setting forth petitioner's liabilities for employment taxes for quarterly periods ending in 2006 as follows:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended and in effect for 2006, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Sec. 7436(e) defines the term "employment tax" as any tax imposed by subtit. C, which encompasses secs. 3101 to 3510 (including FICA and FUTA taxes).

| Tax period ending | Old age, survivor, disability insurance | Hospital insurance | Income tax withholding | Federal unemployment tax |
|---|---|---|---|---|
| Mar. 31 | $1,163.12 | $272.02 | $402 | --- |
| June 30 | 3,124.80 | 730.80 | 1,080 | --- |
| Sept. 30 | 1,302.00 | 304.50 | 450 | --- |
| Dec. 31 | 2,569.28 | 751.10 | 1,110 | $434 |
| Total | 8,159.20 | 2,058.42 | 3,042 | 434 |

Respondent also determined that petitioner is liable for additions to tax and penalties for quarterly periods ending in 2006 as follows:

| Tax period ending | Additions to tax | | Penalty |
|---|---|---|---|
| | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6656 |
| Mar. 31 | $413.36 | $459.29 | $183.71 |
| June 30 | 1,110.51 | 1,233.90 | 493.56 |
| Sept. 30 | 462.71 | 514.13 | 205.65 |
| Dec. 31 | 996.84 | 1,107.60 | 486.44 |

Petitioner filed a timely petition for review of respondent's determination. At the time the petition was filed, petitioner's principal place of business was in California.

After concessions,[3] the issues remaining for decision are: (1) the amount of Sean P. McAlary's compensation that is subject to employment taxes; (2) whether petitioner is liable for additions to tax under section 6651(a)(1) for failing to file Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, and Forms 941, Employer's Quarterly Federal Tax Return; and (3) whether petitioner is liable for penalties under section 6656 for failing to make timely deposits of FICA and FUTA taxes.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

## I. Sean P. McAlary

Mr. McAlary earned a bachelor's degree with a major in business administration from the University of Southern California, and he spent many years working in the computer technology industry. In 2002, at the age of 54, Mr. McAlary obtained a California real estate sales license and began to earn

---

[3]The parties agree that Sean P. McAlary was petitioner's employee throughout 2006 and that no relief is available to petitioner under the Revenue Act of 1978, Pub. L. No. 95-600, sec. 530, 92 Stat. at 2885, as amended. Further, pursuant to a telephone conference call that the Court held with the parties on July 1, 2013, respondent concedes that petitioner is not liable for additions to tax under sec. 6651(a)(2) for the taxable periods in issue.

commissions selling residential real estate in southern California.  He concluded that earning real estate sales commissions would be a good way to generate income to set aside for retirement, and in 2004 he obtained a California real estate broker's license.

## II.  <u>Sean McAlary Ltd, Inc.</u>

Mr. McAlary met Mark Botta, a tax return preparer with offices in Newport Beach, California, and Las Vegas, Nevada, at a business meeting.  Mr. McAlary was impressed with Mr. Botta and hired him to provide business advice and services in connection with his emerging real estate activity.  In 2003 Mr. McAlary, with Mr. Botta's assistance, organized petitioner as a corporation under the laws of the State of Nevada, and petitioner elected to be taxed under subchapter S of chapter 1 of the Code.

Minutes for petitioner's board of directors meeting held on April 1, 2004, state in relevant part as follows:

> Annual Compensation for Sean McAlary, President of the Corporation, shall be based on the number of Revenue Generating Real Estate Agents and Associate Brokers (Affiliates) associated with the Corporation.  The Annual Base Compensation shall be $24,000 when the number of Affiliates is not more than ten (10).  Annual Additional Compensation in the amount of $10,000 shall be earned for each increment of ten (10) Additional Affiliates.  No Additional Compensation shall be earned for any partial increment of ten (10) Affiliates.

III. Petitioner's Operations

Mr. McAlary was petitioner's president, secretary, treasurer, sole director, and sole shareholder. He also was the only person working for the firm that held a real estate broker's license. He managed all aspects of petitioner's operations, including recruiting and supervising sales agents, conducting real estate sales, procuring advertising, purchasing supplies, and maintaining basic books and records. Mr. McAlary often worked 12-hour days with few days off.

Mr. McAlary hoped to grow petitioner's operations by increasing the number of sales agents and associate brokers on petitioner's staff. He discovered, however, that many sales agents wanted to work for larger, established real estate brokerage firms. Petitioner's sales agents operated as independent contractors, and they earned between 60% and 85% of the sales commissions generated on real estate sales they initiated and closed, with petitioner retaining the balance. During 2006 Mr. McAlary supervised eight sales agents, four of whom generated sales commissions for petitioner that year.

Most of petitioner's gross receipts were attributable to sales commissions generated by Mr. McAlary, as opposed to petitioner's other sales agents. Petitioner reported gross receipts and net income for the calendar years 2004 and 2005 as follows:

| Year | Gross receipts | Net income |
|------|----------------|------------|
| 2004 | $376,453 | $122,605 |
| 2005 | 405,244 | 161,660 |

IV. Petitioner's Income Tax Return

Mr. McAlary personally delivered petitioner's tax records for 2006 to Mr. Botta at his office in Las Vegas on March 8, 2007. Although he inquired over the ensuing months about the progress being made in preparing the tax return, he received no response from Mr. Botta. Mr. Botta delivered petitioner's Form 1120S, U.S. Income Tax Return for an S Corporation, to Mr. McAlary in early December 2007.

Mr. McAlary filed petitioner's Form 1120S on December 11, 2007. Petitioner reported gross receipts of $518,189, various deductions totaling $286,735, and net income of $231,454. Petitioner did not issue a Form W-2, Wage and Tax Statement, to Mr. McAlary, nor did it claim a deduction for any amount paid to Mr. McAlary as wages or compensation for services. During 2006 Mr. McAlary transferred a total of $240,000 from petitioner's account to his personal account.

Petitioner did not file Form 940 for 2006 or Form 941 for any quarterly period ending in 2006.

## V. Mr. McAlary's Income Tax Return

Mr. McAlary and his spouse filed a joint Form 1040, U.S. Individual Income Tax Return, on December 11, 2007. Mr. McAlary did not report any amount for wages or salaries on line 7 of the return, nor did he report or pay any self-employment tax during 2006. On Schedule E, Supplemental Income and Loss, Mr. McAlary reported a loss of $15,035 on Part I, Income or Loss From Rental Real Estate and Royalties, income of $200,877 on Part II, Income or Loss From Partnerships and S Corporations, and total income of $185,842 on Part V, Summary.

## VI. Respondent's Expert Witness

At trial the Court received in evidence an expert witness report prepared by Igor Ostrovsky, an employee in the Internal Revenue Service's engineering and valuation program.[4] Mr. Ostrovsky opined that, of the $240,000 that Mr. McAlary received from petitioner during 2006, $100,755 represented reasonable compensation, i.e., the fair market value of the services that Mr. McAlary performed for petitioner that year.

---

[4]Mr. Ostrovsky earned undergraduate degrees in mathematics and electrical engineering and a master of business administration degree from the University of Minnesota. He is recognized as an accredited valuation analyst by the National Association of Certified Valuation Analysts.

In computing Mr. McAlary's reasonable compensation for 2006, Mr. Ostrovsky first concluded that Mr. McAlary's primary job function was that of a real estate broker supervising real estate agents. He then consulted the California Occupational Employment Statistics Survey for 2006,[5] determined that the median wage for a real estate broker in southern California was $48.44 per hour,[6] and multiplied that amount by 2,080 hours (40 hours per week x 52 weeks per year)[7] to arrive at total annual compensation of $100,755.

In support of his conclusion that $100,755 represented reasonable compensation for Mr. McAlary's services during 2006, Mr. Ostrovsky compared petitioner's financial performance with that of its peers in the real estate industry.[8]

[5]The California Occupational Employment Statistics Survey is an annual report produced jointly by the U.S. Department of Labor Bureau of Labor Statistics and the California Department of Labor, and it includes a comprehensive report of wage rates for workers in various industries.

[6]The California Occupational Employment Statistics Survey reported that hourly wages for real estate brokers in southern California ranged from $32.99 (25th percentile) to $64.28 (75th percentile), with a median hourly wage of $48.44.

[7]Mr. Ostrovsky acknowledged that Mr. McAlary reported that he often worked seven days a week, but he nevertheless used a standard 40-hour work week in computing Mr. McAlary's reasonable compensation.

[8]Mr. Ostrovsky defined petitioner's peer group to include businesses described in the North American Industry Classification System (NAICS), Code No. 531210, Offices of Real Estate Agents and Brokers, and, specifically, real

(continued...)

He consulted the Risk Management Association Annual Statement Studies[9] and noted that petitioner's 44.7% profit margin for 2006 far surpassed the 21.9% average profit margin for the industry. As was noted at trial, however, the 44.7% profit margin that Mr. Ostrovsky cited did not account for petitioner's obligation to pay Mr. McAlary's reasonable compensation. Assuming Mr. McAlary's reasonable compensation is $100,755, as Mr. Ostrovsky suggests, petitioner's profit margin only slightly exceeded the industry average.

Mr. Ostrovsky further noted that compensation of $100,755 equaled 19.4% of petitioner's gross receipts of $518,189, and he opined that this level of compensation compared favorably with RMA statistics showing that officers/directors/owners at comparable real estate businesses were compensated

---

[8](...continued)
estate businesses in this category with annual net sales and assets under $1 million.

[9]Risk Management Association (RMA) is a member association comprising financial institutions and professionals that regularly engage in risk analysis (e.g., credit, market, enterprise, and operation risk). RMA compiles financial performance data drawn from the financial statements of its member's customers--primarily small to medium-size businesses, including 457 businesses falling under NAICS Code 531210.

in a range of 7% of net sales (25th percentile) to 18.9% of net sales (75th percentile), with a median of 11% of net sales.[10]

## Discussion

### I. Employment Taxes

Section 7436(a) vests the Court with jurisdiction to review certain determinations made by the Commissioner regarding employment status (worker classification) and to determine the proper amount of employment tax arising from such determination. See Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 102-103 (2003), aff'd, 425 F.3d 1203 (9th Cir. 2005).

Sections 3111 and 3301 impose FICA and FUTA employment taxes on employers in connection with wages paid to their employees. See secs. 31.3121(a)-1(b), 31.3306(b)-1(b), Employment Tax Regs. For Federal employment tax purposes an employee is defined in relevant part as any officer of a corporation. See sec. 3121(d)(1); see also sec. 3306(i). An officer who performs more than minor services for a corporation and who receives remuneration in any form for those services is considered an employee whose wages are subject to

---

[10]Mr. Ostrovsky did not explain how a comparison of compensation measured as a percentage of gross receipts with compensation measured as a percentage of net sales would aid the Court in this case. In the end, we do not find this portion of Mr. Ostrovsky's report to be persuasive or helpful.

Federal employment taxes. Sec. 31.3121(d)-1(b), Employment Tax Regs.; see

Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. 141, 144-145

(2001), aff'd sub nom. Yeagle Drywall Co., Inc. v. United States, 54 Fed. Appx.

100 (3d Cir. 2002).

In general, an S corporation shareholder is taxed on the shareholder's pro

rata share of the corporation's income, regardless of whether the shareholder

actually receives a distribution. Sec. 1366(a)(1). Where the shareholder is also an

employee of the corporation, there is an incentive both for the corporation and for

the employee/shareholder to characterize a payment to the employee/shareholder

as a distribution rather than as compensation because only payments for

compensation are subject to Federal employment taxes. See secs. 3111(a) and (b),

3301; see also Durando v. United States, 70 F.3d 548, 550 n.5, 552 (9th Cir. 1995)

(a shareholder's share of an S corporation's income is not subject to self-

employment tax). In such instances, the Commissioner may recharacterize a

distribution as compensation in order to reflect the true nature of the payment. See

Rev. Rul. 74-44, 1974-1 C.B. 287 ("dividends" paid to S corporation shareholders

treated as reasonable compensation for services rendered and subjected to Federal

employment taxes); see also Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. at 145-146.

## II. Reasonable Compensation

The parties agree that Mr. McAlary was petitioner's employee within the meaning of section 3121(d) during 2006. Indeed, he performed substantial professional services for petitioner that year. The question presented is the value of those services and, more precisely, the amount to be treated as Mr. McAlary's compensation for purposes of computing petitioner's Federal employment tax liabilities.

As previously mentioned, respondent asserts that $100,755 of the $240,000 Mr. McAlary received from petitioner during 2006 should be treated as his wages. Respondent avers that Mr. McAlary, acting in his capacities as petitioner's sole officer and real estate broker, performed a variety of services that were essential to petitioner's operations and overall success.

Petitioner contends that the Court should respect the remuneration agreement between Mr. McAlary and petitioner which set his annual base pay at $24,000 and provided for increased compensation if Mr. McAlary was able to recruit additional sales agents and associate brokers. Petitioner further contends, with little elaboration, that in the light of petitioner's modest operations, Mr.

McAlary's compensation should be measured by ranking petitioner in the 10th percentile of comparable real estate businesses in southern California.

We are not persuaded that the remuneration agreement represents a sound measure of the value of the services that Mr. McAlary provided to petitioner during 2006. We cast a skeptical eye on the agreement inasmuch as Mr. McAlary sat on both sides of the table when the agreement was executed, occupying the positions of both employer and employee. The agreement clearly was not the product of an arm's-length negotiation. See Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), aff'g T.C. Memo. 1973-130. Additionally, although the number of real estate sales agents and associate brokers that Mr. McAlary supervised is a factor to consider in determining his reasonable compensation, it is only one factor among many. Finally, there is no evidence in the record that petitioner actually paid Mr. McAlary any amount pursuant to the agreement, suggesting that it was forgotten, ignored, or adopted as mere window dressing.

Courts have weighed various factors in assessing the reasonableness of compensation, including the employee's qualifications, the nature, extent, and scope of the employee's work, the size and complexity of the business, prevailing general economic conditions, the employee's compensation as a percentage of

gross and net income, the employee/shareholder's compensation compared with distributions to shareholders, the employee/shareholder's compensation compared with that paid to nonshareholder/employees, prevailing rates of compensation for comparable positions in comparable concerns, and comparable compensation paid to a particular shareholder/employee in previous years where the corporation has a limited number of officers. Charles Schneider & Co. v. Commissioner, 500 F.2d at 151-152; K & K Veterinary Supply, Inc. v. Commissioner, T.C. Memo. 2013-84, at *9-*10. Whether compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case, and no single factor is decisive. Joly v. Commissioner, T.C. Memo. 1998-361, aff'd without published opinion, 211 F.3d 1269 (6th Cir. 2000).

During 2006 Mr. McAlary single-handedly conducted petitioner's daily business operations, making all management decisions while also engaging in real estate sales transactions on petitioner's behalf as both a broker and a sales agent. Even though Mr. McAlary was relatively new to the real estate sales industry, the commissions that he earned as a sales agent and a broker represented most of petitioner's gross receipts. We recognize that petitioner's financial success was attributable in no small part to favorable real estate market conditions. Nevertheless, although petitioner's operation was modest and the number of

agents that Mr. McAlary supervised was small, he was committed to the success of the operation as evidenced by his willingness to work long hours with few days off. Petitioner's profit margin during the year in issue slightly exceeded the average of its peers in the industry.

Respondent's expert, Mr. Ostrovsky, opined that petitioner could have expected to pay $48.44 per hour, or $100,755 annually, to an individual in exchange for the various services that Mr. McAlary performed for the firm during 2006. Although the $48.44 hourly rate represents the median hourly wage for real estate brokers in southern California during the periods in issue, the portion of Mr. Ostrovsky's report purporting to reconcile his conclusion with the compensation practices of petitioner's industry peers was not persuasive.

Determining an employee's reasonable compensation is dependent upon a number of factors and is far from an exact science. Considering the totality of the facts and circumstances, including the pertinent wage and labor statistics cited in Mr. Ostrovsky's report, general market conditions, Mr. McAlary's somewhat limited experience, and petitioner's modest operations, we hold that an hourly rate of $40 (i.e., annual compensation of $83,200) represents reasonable compensation for the various services that Mr. McAlary performed for petitioner during 2006.

III.  Additions to Tax and Penalties:  Sections 6651(a)(1) and 6656

Respondent determined that petitioner is liable for additions to tax under section 6651(a)(1) for failing to file Forms 940 and 941 and for penalties under section 6656 for failing to make timely deposits of FICA and FUTA taxes.

Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  The addition to tax is equal to 5% of the amount of the tax required to be shown on the return if the failure to file is not for more than one month.  Sec. 6651(a)(1).  An additional 5% is imposed for each month or fraction thereof in which the failure to file continues, to a maximum of 25% of the tax.  Id. If a taxpayer exercised ordinary business care and prudence and was nonetheless unable to file the return within the date prescribed by law, then reasonable cause exists.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  "Willful neglect" means a "conscious, intentional failure or reckless indifference."  United States v. Boyle, 469 U.S. 241, 245 (1985).

Section 6656(a) imposes a penalty for failure to deposit any amount of tax with a Government depository.  As relevant herein, the penalty is equal to 10% of the underpayment if the failure is for more than 15 days.  Sec. 6656(b)(1)(A)(iii). As is true with respect to the addition to tax under section 6651(a)(1), a taxpayer

may avoid a penalty under section 6656(a) if the taxpayer's failure to make a required deposit was due to reasonable cause and not willful neglect.

Mr. McAlary testified that he provided petitioner's tax information to petitioner's accountant, Mr. Botta, and that he counted on him to properly compute petitioner's tax liabilities. Reliance on the advice of a tax professional may establish reasonable cause and good faith. See United States v. Boyle, 469 U.S. at 250. Reliance on a tax professional, however, is not an absolute defense but merely a factor to be considered. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). Whether reasonable cause exists when a taxpayer has relied upon a tax professional to prepare a tax return must be determined upon a review of all the facts and circumstances. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). We have held that for a taxpayer to rely reasonably upon the advice of a tax professional, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Id. at 99.

Other than Mr. McAlary's testimony that he generally was impressed with Mr. Botta, there is no evidence that petitioner investigated Mr. Botta's background or qualifications or that petitioner otherwise confirmed that Mr. Botta was a competent professional who had sufficient expertise to justify reliance on his advice. Considering all the facts and circumstances, we are not persuaded that petitioner exercised ordinary business care and prudence and was nonetheless unable to file Forms 940 and 941 by the date prescribed by law or unable to remit the proper amount of employment taxes to the Government. Consequently, we sustain respondent's determination that petitioner is liable for additions to tax under section 6651(a)(1) and penalties under section 6656(a) for the taxable periods in issue.

Consistent with the preceding discussion,

<u>Decision will be entered</u>

<u>under Rule 155</u>.