# United States Tax Court

T.C. Memo. 2024-41

BURT KRONER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

———————

Docket No. 23983-14.                        Filed April 8, 2024.

———————

*Barbara T. Kaplan*, *G. Michelle Ferreira*, and *Scott E. Fink*, for petitioner.

*Adrienne E. Griffin*, *Geoffrey J. Klimas*, and *Nina P. Ching*, for respondent.

## SUPPLEMENTAL MEMORANDUM
## FINDINGS OF FACT AND OPINION

MARVEL, *Judge*: In *Kroner I*, we upheld respondent's determination that transfers of funds to petitioner, Burt Kroner, during 2005–07 (years at issue) did not constitute gifts under section 102[2] and that Mr. Kroner improperly excluded them from gross income. We also held that Mr. Kroner was not liable for accuracy-related penalties under section 6662(a) because respondent failed to meet his burden of production under section 6751(b) to show that the penalties received

———

[1] This Opinion supplements our previously filed opinion *Kroner v. Commissioner* (*Kroner I*), T.C. Memo. 2020-73, *rev'd in part*, *Kroner v. Commissioner* (*Kroner II*), 48 F.4th 1272 (11th Cir. 2022).

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, and regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times.

[*2] timely supervisory approval. After an appeal by respondent, however, the U.S. Court of Appeals for the Eleventh Circuit held that we "improperly concluded that Kroner's penalties were procedurally invalid for failure to comply with Section 6751(b)" and reversed the portion of our decision disallowing the accuracy-related penalties. *See Kroner II*, 48 F.4th at 1281. The remaining issues for our decision are (1) whether Mr. Kroner is liable for accuracy-related penalties for the years at issue and (2) whether the section 6664(c) reasonable cause exception to accuracy-related penalties applies.[3] We hold that Mr. Kroner is liable for accuracy-related penalties for the years at issue and that the section 6664(c) reasonable cause exception is inapplicable under the circumstances here.

FINDINGS OF FACT

We incorporate our findings of fact in *Kroner I* and summarize them here as background before making supplemental findings of fact. Some of the facts have been stipulated and are so found. The First and Second Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. Mr. Kroner resided in Florida when he filed his Petition.

I. *Summary of* Kroner I *Findings*

Mr. Kroner has worked extensively in the discounted cashflow industry. *Kroner I*, T.C. Memo. 2020-73, at *2. In the early 1990s, through his work, Mr. Kroner met and developed a business relationship with David Haring, *id.*, who did not testify at trial, *id.* at *9. Mr. Kroner received wire transfers from Mr. Haring or entities associated with him in the aggregate amounts of $4,425,000 in 2005, $15,350,000 in 2006, and $5 million in 2007. *Id.* at *3–4.

Robert Bernstein, an attorney who represented both Mr. Haring and Mr. Kroner, *id.*, advised Mr. Kroner that the transfers he received from Mr. Haring were excludable from income under section 102, *Kroner I*, T.C. Memo. 2020-73, at *4. Mr. Bernstein provided this advice

---

[3] On August 4, 2023, Mr. Kroner filed a Notice of Proceeding in Bankruptcy. On August 8, 2023, we filed an Order recognizing that all proceedings in this case were automatically stayed pursuant to 11 U.S.C. § 362(a)(8). On March 7, 2024, we filed an Order acknowledging that the U.S. Bankruptcy Court for the Southern District of Florida (West Palm Beach Division) had granted Mr. Kroner relief from the automatic stay to prosecute the remaining issues before this Court on remand and ordering the automatic stay lifted.

[*3] on the basis of (1) a conversation with Mr. Kroner and (2) a note that he and Antony Mitchell, an associate of Mr. Haring, had drafted. *Id.* Mr. Kroner did not report any of the transfers from Mr. Haring as income during the years at issue.[4] *Id.* at *5. In 2007, using some of the transferred funds, Mr. Kroner repaid a loan that Mr. Haring had made through an entity to fund Mr. Kroner's credit counseling business. *Id.* at *2, *16.

We now summarize Mr. Kroner's version of events without making any finding that they actually occurred. *Id.* at *13 n.5. Mr. Kroner's explanation of the transfers was that in addition to their business relationship, he and Mr. Haring purportedly developed a close personal relationship in the 1990s. *Id.* at *15. In 2005 Mr. Kroner received a two-to-three-minute phone call from Mr. Haring. *Id.* at *17. Mr. Haring purportedly informed Mr. Kroner that he had a surprise for Mr. Kroner and that he needed Mr. Kroner's bank information. *Id.* Mr. Kroner later met with Mr. Mitchell, who informed Mr. Kroner that he would receive a series of gifts that would require his bank information in order to enable wire transfers into his account. *Id.* at *17–18. Mr. Mitchell and Mr. Bernstein then drafted a note to Mr. Kroner from Mr. Haring stating in part: "I would like to make you a monetary gift." *Id.* at *18. After Mr. Kroner received the note, which was dated January 18, 2005, Mr. Haring began making transfers. *Id.* at *18–19. Mr. Haring determined the amount and source of each transfer, and Mr. Kroner determined the account to which funds would be transferred. *Id.* at *19. After Mr. Kroner received each transfer, he would confirm that he received it, and Mr. Mitchell would set up a phone call for Mr. Kroner to thank Mr. Haring. *Id.*

We rejected Mr. Kroner's version of events for numerous reasons, including (1) the lack of credible testimonial or documentary evidence supporting it, (2) our doubts as to the authenticity or credibility of the

---

[4] Mr. Bernstein advised Mr. Kroner of the requirement to file Form 3520, Annual Return to Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, for each year that Mr. Kroner received a transfer from Mr. Haring into an account titled in his name. *Kroner I*, T.C. Memo. 2020-73, at *4–5. Mr. Kroner, however, had also established two trusts, one in Nevis and one in the Bahamas, and owned an interest in a closely held business, Private Capital Ventures (PCV). *Id.* at *3. The Bahamas trust was established at UBS. *Id.* Mr. Haring transferred some of the funds to the Nevis trust, PCV, and an entity owned by the Bahamas trust rather than to Mr. Kroner personally. *Id.* at *4. With respect to those transfers, Mr. Bernstein advised Mr. Kroner that no reporting was required. *Id.* at *5. Mr. Bernstein prepared Mr. Kroner's Forms 3520 for the years at issue. *Id.*

[*4] note, (3) the fact that the timing of the transfers correlated with liquidity events experienced by Mr. Haring as an investor in Settlement Funding, LLC, doing business as Peachtree Settlement Funding (Peachtree), a business in which Mr. Kroner was prevented from investing because of a noncompete agreement that he had signed, (4) facts suggesting a willingness on Mr. Kroner's and Mr. Haring's parts to participate in nominee arrangements, and (5) the nature of the relationship between Mr. Kroner and Mr. Haring.[5]  *Id.* at *19–23.  A summary of Peachtree's liquidity events and the alleged gift distributions with relevant dates, *id.* at *17, *22, is set out below:

| Date | Event |
|---|---|
| February 4, 2005 | First liquidity event: LLR Partners, Inc., and Greenhill Capital Partners make a private equity investment in Peachtree |
| February 4, 2005 | Transfer of $2.6 million from Mr. Haring to Mr. Kroner |
| March 2006 | Second liquidity event: Peachtree goes public on the London Stock Exchange |
| April 2006 | Transfer of $6 million from Mr. Haring to Mr. Kroner |
| November 2006 | Third liquidity event: Credit Suisse acquires Peachtree |
| December 2006 | Transfer of $8.75 million from Mr. Haring to Mr. Kroner |

Nonetheless, relying on this Court's precedent, we also held that respondent could not satisfy his initial burden of production under section 6751(b) to support the imposition of accuracy-related penalties because the initial determination to impose the penalties occurred before supervisory approval of those penalties occurred. *Kroner I*, T.C. Memo. 2020-73, at *25–31.  We did not address the merits of respondent's determination that Mr. Kroner was liable for accuracy-

---

[5] We also viewed the "series of transfers and their abrupt end as odd" and questioned why Mr. Haring did "not begin by forgiving the outstanding . . . loan rather than making transfers far exceeding the loan balance and then expecting repayment of the loan." *Kroner I*, T.C. Memo. 2020-73, at *23 n.11.

[*5] related penalties or Mr. Kroner's assertion of the reasonable cause exception.

II.     *Supplemental Findings of Fact*

We now make supplemental findings of fact relevant to the issues remaining for our decision. These findings primarily concern the advice Mr. Bernstein gave Mr. Kroner that the transfers from Mr. Haring were nontaxable gifts under section 102.

Mr. Bernstein became Mr. Kroner's tax attorney in 1996. Over the course of his representation, Mr. Bernstein provided tax, estate planning, asset protection, and corporate law advice to Mr. Kroner. Mr. Bernstein also represented Mr. Haring at the time of the transfers to Mr. Kroner and provided Mr. Haring with tax advice in connection with those transfers. Nonetheless, Mr. Bernstein did not speak to Mr. Haring personally about his intentions in making the transfers; instead, he conversed only with Mr. Mitchell.

After receiving the January 18, 2005, note from Mr. Haring, Mr. Kroner discussed the tax treatment of the transfers with Mr. Bernstein. Mr. Kroner provided the note to Mr. Bernstein and asked him how the transfers from Mr. Haring would be treated from a legal and tax point of view. Mr. Bernstein advised him that the transfers would be tax free. We reject as not credible Mr. Bernstein's self-serving testimony that he asked Mr. Kroner "some probing questions," including whether Mr. Haring held a disguised ownership interest in a company for Mr. Kroner.[6]

Anthony DeAquino, an accountant, prepared Mr. Kroner's Form 1040, U.S. Individual Income Tax Return, for each year at issue. There is no evidence that Mr. Kroner specifically informed Mr. DeAquino about the transfers from Mr. Haring, the scope of his business relationship with Mr. Haring, the existence of the liquidity events and their

---

[6] We did not find Mr. Bernstein's testimony at trial to be credible in general, *Kroner I*, T.C. Memo. 2020-73, at *19, and there is no documentary evidence concerning the advice he gave to Mr. Kroner or the factual and legal assumptions he made in reaching it. Mr. Kroner's testimony did not indicate that Mr. Bernstein asked him a series of probing questions. Furthermore, Mr. Bernstein and Mr. Mitchell had already drafted the gift note together before Mr. Kroner approached Mr. Bernstein for advice regarding whether Mr. Haring's transfers were gifts. Thus, by the time Mr. Kroner asked Mr. Bernstein for advice, Mr. Bernstein was already involved in efforts to document the transfer from Mr. Haring as a gift and likely would not have undertaken a thorough effort to determine whether the transfers qualified as gifts.

**[\*6]** proximity to the alleged gift distributions, or the advice he had received from Mr. Bernstein. Instead, Mr. Kroner testified only that "[e]very year he would provide me with a list of what he needed to do my returns, all centering around the money coming in and the expenses going out. And whatever was on his list I provided to him for . . . tax preparation purposes." Mr. Bernstein, not Mr. DeAquino, prepared Mr. Kroner's Form 3520 for each year at issue.

## OPINION

Respondent determined accuracy-related penalties on grounds of negligence or disregard of rules or regulations, *see* § 6662(b)(1), (c), or in the alternative, on grounds of substantial understatement of income tax, *see* § 6662(b)(2), (d). The Commissioner bears the burden of production with respect to the accuracy-related penalties. *See* § 7491(c). Once the Commissioner comes forward with sufficient evidence to show that it is appropriate to impose a particular penalty, the taxpayer has the burden of proof to show that the Commissioner's penalty determination is incorrect, including the burden of proving that penalties are inappropriate because of reasonable cause. *See Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). The Eleventh Circuit's holding that respondent satisfied the requirements of section 6751(b), *see Kroner II*, 48 F.4th at 1274, is the law of the case, *see Pollei v. Commissioner*, 94 T.C. 595, 601 (1990) ("A holding on an issue by an appellate court must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court.").

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax attributable to any substantial understatement of income tax, *see* § 6662(b)(2), or negligence or disregard of rules or regulations, *see* § 6662(b)(1). An understatement is substantial if it exceeds the greater of (1) 10% of the tax required to be shown on the return for the taxable year or (2) $5,000. *See* § 6662(d)(1)(A). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, and disregard includes any careless, reckless, or intentional disregard. *See* § 6662(c). The understatements in this case are substantial as an arithmetic matter for all of the years at issue. It is therefore unnecessary for us to determine whether the underpayments are attributable to negligence or disregard of rules or regulations. *See* Treas. Reg. § 1.6662-2(c) (providing that only one accuracy-related penalty for a given year may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground). Respondent has met his burden

[*7] of production with regard to the accuracy-related penalties, and Mr. Kroner has the burden of proof to show that respondent's penalty determination is incorrect.

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and the taxpayer acted in good faith. *See Higbee*, 116 T.C. at 448. This determination is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. *See* Treas. Reg. § 1.6664-4(b)(1). Mr. Kroner asserts that he had reasonable cause for, and acted in good faith with respect to, the underpayments.

Generally, the most important factor in determining whether the section 6664(c)(1) reasonable cause and good faith exception applies is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. *See* Treas. Reg. § 1.6664-4(b)(1). Reliance on professional advice may constitute reasonable cause and good faith, but only if considering all the circumstances such reliance was reasonable. *See id.* paras. (b)(1), (c)(1); *see also Freytag v. Commissioner*, 89 T.C. 849, 888 (1987), *aff'd*, 904 F.2d 1011 (5th Cir. 1990), *aff'd*, 501 U.S. 868 (1991). Advice is "any communication . . . setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty." Treas. Reg. § 1.6664-4(c)(2). Advice does not have to be in any particular form. *Id.* Reasonable cause exists if a taxpayer relies in good faith on the advice of a qualified tax adviser where the following three elements are present: (1) the adviser was a competent professional who had sufficient expertise to justify the reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

At a minimum, Mr. Kroner has failed to show that he provided Mr. Bernstein with necessary and accurate information to determine the tax consequences of the transfers. There is no evidence that Mr. Kroner ever disclosed many of the considerations that we found decisive in *Kroner I* to Mr. Bernstein, including (1) the noncompete agreement that prevented him from investing in Peachtree, (2) Peachtree's upcoming liquidity events, (3) Mr. Kroner's and Mr. Haring's history of participating in nominee arrangements with each other, or (4) the exact

**[\*8]** details of their business and personal relationship.[7]  There is also no documentary evidence of the nature of the advice that Mr. Bernstein gave to Mr. Kroner or the factual and legal assumptions on which it was based.  Furthermore, there is little indication of what Mr. Bernstein knew or did not know about the arrangement from his representation of Mr. Haring or his contacts with Mr. Mitchell.  While advice need not take any particular form, Mr. Kroner cannot meet his burden of proof solely through witness testimony, such as his own and Mr. Bernstein's, that lacks credibility.

Other facts support our finding that Mr. Kroner did not supply Mr. Bernstein with necessary and accurate information to determine the taxability of the transfers.  Mr. Bernstein testified:

> I had no idea . . . how much [Mr. Haring] . . . was giving, when he was giving it, where he was giving it to, aside from the UBS trust that was set up in '07.  You know, where the money was going, how much, when it was going, I had no idea in advance on all the gifts, other than the money that went into the UBS trust.  And even there I'm not sure I had perfect knowledge of how much he was going to put in until he put it in.

While it may not have been necessary for Mr. Kroner to provide Mr. Bernstein with a complete accounting of the size or frequency of the transfers in advance, Mr. Bernstein's alleged overall lack of understanding of the nature of the transfers undermines the contention that Mr. Kroner provided him with necessary and accurate information before he gave advice.  For one, Mr. Bernstein disclaimed any knowledge that the timing of the transfers correlated to liquidity events experienced by Mr. Haring as an investor in Peachtree.  In addition, large transfers between business associates may make a business purpose more likely and a gift purpose less likely, at least under circumstances similar to those here, but Mr. Bernstein claims that he did not know the magnitude of the transfers.

---

[7] Although we did not conclusively decide in *Kroner I* that Mr. Haring's transfers were made in respect of a disguised interest or as part of a nominee arrangement, *see Kroner I*, T.C. Memo. 2020-73, at \*23 (holding only that Mr. Kroner did not meet his burden of proof to show that respondent's determination was incorrect), disclosure of the facts that could have led to such a conclusion was warranted.

**[\*9]**  Finally, Mr. Bernstein gave Mr. Kroner advice and purportedly questioned him in detail about the transfers after Mr. Bernstein had already worked with Mr. Mitchell to draft Mr. Haring's gift note, which stated in part: "I would like to make you a monetary gift." *Kroner I*, T.C. Memo. 2020-73, at \*18.  It is unlikely that Mr. Bernstein undertook a thorough effort to uncover the nature of the transactions and provide objective advice to Mr. Kroner after he had already tried to document the transfers as gifts.  Regardless, there is no evidence that Mr. Kroner supplied Mr. Bernstein with necessary and accurate information in response to any questioning that Mr. Bernstein may have undertaken.[8]

No party contends that Mr. Bernstein is not a competent professional, but we need not mince words: If Mr. Kroner accurately provided Mr. Bernstein with all of the information needed to determine the taxability of Mr. Haring's transfers, and Mr. Bernstein determined that the transfers were tax free, then it was remarkably bad advice.  At a minimum, if Mr. Bernstein had been apprised of the relevant facts, the Supreme Court's holding in *Commissioner v. Duberstein*, 363 U.S. 278 (1960), would likely have put him on notice that there was a serious risk that the transfers would not be treated as gifts for federal income tax purposes.  We think that the better explanation is the one supported by the record: Mr. Kroner did not supply Mr. Bernstein with necessary and accurate information to reach an informed judgment about the taxability of the transfers.  Even if he had, we are unconvinced that Mr. Kroner actually relied in good faith on Mr. Bernstein's advice given that there is no evidence that he informed Mr. DeAquino of the transfers from Mr. Haring, or of Mr. Bernstein's advice with respect to the transfers, when Mr. DeAquino prepared Mr. Kroner's income tax returns.[9]  In sum, Mr. Kroner has not proven that he had reasonable cause for, or acted in good faith with respect to, the underpayments in this case.

We have considered the parties' other arguments and, to the extent they are not discussed herein, find them to be irrelevant, moot, or without merit.

---

[8] It is worth noting that in Mr. Bernstein's account (even though we do not credit it) when Mr. Bernstein purportedly questioned Mr. Kroner about disguised ownership interests, Mr. Kroner purportedly did not mention any of the relevant considerations and instead told Mr. Bernstein only that he had no such disguised interest.  Therefore, even if we had credited Mr. Bernstein's account, it would not aid Mr. Kroner's reasonable cause and good faith defense.

[9] For each year at issue, Mr. Bernstein, not Mr. DeAquino, prepared the Form 3520 on which some of the transfers were reported.

**[*10]**  To reflect the foregoing,

*An appropriate decision will be entered.*